MOE, SHERIFF, ᴇᴛ ᴀʟ. *v.* CONFEDERATED SALISH
AND KOOTENAI TRIBES OF THE FLAT-
HEAD RESERVATION ᴇᴛ ᴀʟ.

No. 74–1656.   Argued January 20, 1976—Decided April 27, 1976*

---

*Together with No. 75–50, *Confederated Salish and Kootenai
Tribes of the Flathead Reservation et al.* v. *Moe, Sheriff, et al.*,
also on appeal from the same court.

464

Rеннquist, J., delivered the opinion for a unanimous Court.

*Sam E. Haddon,* Special Assistant Attorney General of Montana, argued the cause for appellants in No. 74–1656 and appellees in No. 75–50. With him on the briefs were *Robert L. Woodahl,* Attorney General, and *Jean A. Turnage,* Special Assistant Attorney General.

*Richard A. Baenen* argued the cause and filed a brief for appellees in No. 74–1656 and appellants in No. 75–50.†

Mr. Justice Rеннquist delivered the opinion of the Court.

We are called upon in these appeals to resolve several questions arising out of a conflict between the asserted taxing power of the State of Montana and the immunity claimed by the Confederated Salish and Kootenai Tribes (Tribe) and its members living on the tribal reservation. Convened as a three-judge court,[1] the District Court for the District of Montana considered separate attacks on the State's cigarette sales and personal property taxes as applied to reservation Indians. After finding that the suits were not barred by the prohibition of 28 U. S. C.

---

†Briefs of *amici curiae* were filed by *Slade Gorton,* Attorney General, and *Richard H. Holmquist,* Assistant Attorney General, for the State of Washington; and by *Michael Taylor* for the Quinault Indian Nation.

[1] See 28 U. S. C. § 2281.

§ 1341,[2] the District Court entered final judgments which, with one exception, sustained the Tribe's challenges, and from which the State has appealed (No. 74–1656). The Tribe has cross-appealed from that part of the judgments upholding tax jurisdiction over on-reservation sales of cigarettes by members of the Tribe to non-Indians. We noted probable jurisdiction under 28 U. S. C. § 1253 and consolidated the appeal and cross-appeal.[3]   423 U. S. 819 (1975). Concluding that the District Court had the power to grant injunctive relief in favor of the Tribe, and that it was correct on the merits, we affirm in both cases.

## I

In 1855 an expanse of land stretching across the Bitter Root River Valley and within the then Territory of Washington was reserved for "the use and occupation" of the "confederated tribes of the Flathead, Kootenay, and Upper Pend d'Oreilles Indians," by the Treaty of Hell Gate, which in 1859 was ratified by the Senate and proclaimed by President Buchanan.   12 Stat. 975. Slightly over half of its 1.25 million acres is now owned in fee, by both Indians and non-Indians; most of the remaining half is held in trust by the United States for the Tribe.   Approximately 50% of the Tribe's current membership of 5,749 resides on the reservation and in turn composes 19% of the total reservation population. Embracing portions of four Montana counties—Lake, Sanders, Missoula, and Flathead—the present reservation was generally described by the District Court:

"The Flathead Reservation is a well-developed

---

[2] See Part II, *infra,* for the discussion of the jurisdictional question.

[3] For ease of reference, the various parties involved in the appeal and cross-appeal will be referred to simply as the State and the Tribe, except as otherwise noted.

agricultural area with farms, ranches and communities scattered throughout the inhabited portions of the Reservation. While some towns have predominantly Indian sectors, generally Indians and non-Indians live together in integrated communities. Banks, businesses and professions on the Reservation provide services to Indians and non-Indians alike.

"As Montana citizens, members of the Tribe are eligible to vote and do vote in city, county and state elections. Some hold elective and appointed state and local offices. All services provided by the state and local governments are equally available to Indians and non-Indians. The only schools on the Reservation are those operated by school districts of the State of Montana. The State and local governments have built and maintain a system of state highways, county roads and streets on the Reservation which are used by Indians and non-Indians without restriction." 392 F. Supp. 1297, 1313 (1975).

Joseph Wheeler, a member of the Tribe, leased from it two tracts of trust land within the reservation whereon he operated retail "smoke shops." Deputy sheriffs arrested Wheeler and an Indian employee for failure to possess a cigarette retailer's license and for selling non-tax-stamped cigarettes, both misdemeanors under Montana law. These individuals, joined by the Tribe and the tribal chairmen, then sued[4] in the District Court for declaratory and injunctive relief against the State's cigarette tax and vendor-licensing statutes as applied to

---

[4] The defendants-appellants in the cigarette tax case are Montana's Department of Revenue, its director, and the sheriffs of the counties in which the "smoke shops" were located. No monetary relief has been sought in this action.

468

tribal members who sold cigarettes within the reservation.[5] That court by a divided vote held that our decision in *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973), barred Montana's efforts to impose its cigarette tax statutes on the Tribe's retail cigarette sales with one exception: it may require a precollection of the tax imposed by law upon the non-Indian purchaser of the cigarettes.[6]

In a later action, the Tribe and four enrolled members, all residents of the reservation, challenged[7] Montana's

---

[5] Suit was brought shortly after the arrests. The record does not indicate whether criminal proceedings were instituted in state court, and in any case the State has made no claim as to the propriety of the District Court's entry of relief under *Younger* v. *Harris*, 401 U. S. 37 (1971), and related decisions of this Court.

[6] The District Court noted that the State's present statutory scheme contemplates advance payment or "precollection" of the sales tax by the retailer when he purchases his inventory from the wholesaler. Recognizing that its holding—a distinction between sales to Indians and to non-Indians—would result in "complicated problems" of enforcement by the State, the District Court deferred passing on these problems pending a decision by this Court. We, of course, express no·opinion on this question.

[7] Named as defendants were various county officials, the State's Department of Revenue and its director, and the State itself. In contrast to the cigarette tax case, however, the plaintiffs, suing as representatives of all other members of the Tribe residing on the reservation, demanded a refund of personal property taxes paid to the date of the District Court's final judgment. In the opinion accompanying the District Court's judgment entering the requested declaratory and injunctive relief in favor of the Tribe and the individual Indians, it stated that "any further questions" were reserved pending this Court's final determination of the constitutionality of the personal property tax statutes. Our conclusions in Parts II and III, *infra*, that the District Court, with subject-matter jurisdiction over the Tribe's claims, properly entered injunctive relief in its favor implicitly embrace a finding that the Tribe, *qua* Tribe, has a discrete claim of injury with respect to these forms of state

statutory scheme for assessment and collection of personal property taxes, in particular the imposition of such taxes on motor vehicles owned by tribal members residing on the reservation.[8]  The District Court, again by a divided vote, found its earlier decision interpreting *McClanahan* controlling in the Tribe's favor.  While recognizing, as did the Tribe, that a fee required for registration and issuance of state license plates for a motor vehicle could be exacted from Indians residing on the reservation,[9] the court held that the additional personal property tax which was likewise made a condition precedent for lawful registration of the vehicle could not be imposed on reservation Indians.

---

taxation so as to confer standing upon it apart from the monetary injury asserted by the individual Indian plaintiffs.  Since the substantive interest which Congress has sought to protect is tribal self-government, such a conclusion is quite consistent with other doctrines of standing.  See, *e. g., Warth* v. *Seldin,* 422 U. S. 490, 498–499 (1975).  Whether in like fashion standing rests in the Tribe to litigate the pending individual refund claims is a question properly left for the District Court as and when these claims are pursued, and we express no opinion thereon.  We note, however, that if only the individual Indians have standing to sue for refunds, their claims must be properly grounded jurisdictionally.  See, *e. g., Zahn* v. *International Paper Co.,* 414 U. S. 291, 294 (1973).

[8] The Tribe and the individual members had earlier filed an identical attack against Montana's personal income tax as applied to income earned by tribal members on the reservation.  Shortly after this Court's decision in *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973), the State stipulated that *McClanahan* barred its taxing jurisdiction in this respect and agreed to cease voluntarily its collection efforts and make refunds.  Relying on this settlement, the Tribe thereafter requested the State's Attorney General to order a similar cessation with respect to personal property taxes.  Advised that its request was rejected, the Tribe instituted this action.

[9] The Tribe has from the beginning expressly disclaimed any immunity from this nondiscriminatory vehicle registration fee.

## II

The important threshold question in both cases is whether the District Court was prohibited from entertaining jurisdiction over these suits to restrain Montana's taxing authority, inasmuch as Congress has provided that

"[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341.

By enacting this jurisdictional rule, Congress gave explicit sanction to the pre-existing federal equity practice: because interference with a State's internal economy is inseparable from a federal action to restrain state taxation,

" 'the mere illegality or unconstitutionality of a state . . . tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved.' *Matthews* v. *Rodgers,* [284 U. S. 521, 525–526 (1932)]." *Great Lakes Co.* v. *Huffman,* 319 U. S. 293, 298 (1943).

This broad jurisdictional barrier, however, has been held by this Court to be inapplicable to suits brought by the United States "to protect itself and its instrumentalities from unconstitutional state exactions." *Department of Employment* v. *United States,* 385 U. S. 355, 358 (1966).[10]

---

[10] There the United States sought injunctive relief against certain state taxation of its coplaintiff, the American National Red Cross, which on the merits this Court held was immune from same as a federal instrumentality.

The District Court, citing *Department of Employment* and cases from other courts, concluded:

"While the exceptions to § 1341 have been expressed most often in terms of the Federal instrumentality doctrine, we do not view the exceptions as limited to cases where this doctrine is clearly applicable. It seems clear [that § 1341] does not bar federal court jurisdiction in cases where immunity from state taxation is asserted on the basis of federal law with respect to persons or entities in which the United States *has a real and significant interest.*" 392 F. Supp., at 1303 (emphasis added).

In its brief the State argues that any reliance on the federal-instrumentality doctrine, either as such or as expanded by the District Court, for purposes of finding *jurisdiction* in these cases is contrary to the *substantive* decisions of this Court which "cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation." *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 150 (1973). See *McClanahan,* 411 U. S., at 170 n. 5; *Oklahoma Tax Comm'n* v. *Texas Co.,* 336 U. S. 342 (1949); *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598 (1943).

We have indeed recently declined "the invitation to resurrect the expansive version of the intergovernmental-immunity doctrine that has been so consistently rejected" in this kind of case. *Mescalero, supra,* at 155. While the concept of a federal instrumentality may well have greater usefulness in determining the applicability of § 1341, *Department of Employment* v. *United States, supra,* than in providing the touchstone for deciding whether or not Indian tribes may be taxed, *Mescalero, supra,* we do not believe that the District Court's ex-

panded version of this doctrine, quoted above, can by itself avoid the bar of § 1341.

The District Court, however, also relied on a more recent jurisdictional statute, 28 U. S. C. § 1362, which provides:

> "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

Sections 1341 and 1362 do not cross-reference each other. Since presumably all actions properly within the jurisdiction of the United States district courts are authorized by one or another of the statutes conferring jurisdiction upon those courts, the mere fact that a jurisdictional statute such as § 1362 speaks in general terms of "all" enumerated civil actions does not itself signify that Indian tribes are exempted from the provisions of § 1341.[11]

Looking to the legislative history of § 1362 for whatever light it may shed on the question, we find an indication of a congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought. Section 1362 is characterized by the reporting House Judiciary Committee as providing "the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attor-

---

[11] Section 1341 itself, of course, includes a proviso that the remedy in state court must be "plain, speedy and efficient." The Tribe does not claim that it would not have had such a remedy under Montana law.

neys." [12]   While this is hardly an unequivocal statement of intent to allow such litigation to proceed irrespective of other explicit jurisdictional limitations, such as § 1341, it would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising "under the Constitution, laws, or treaties" would be at least in some respects as broad as that of the United States suing as the tribe's trustee.

That the United States could have brought these actions, by itself or as coplaintiff, seems reasonably clear. In *Heckman* v. *United States,* 224 U. S. 413 (1912), the United States sued to cancel numerous conveyances by Cherokee allottees-grantors, who were not parties, as violative of federal restrictions upon the Indians' power of alienation.   In the course of concluding that the United States had the requisite interest in enforcing these restrictions for the Indians' benefit, the Court discussed *United States* v. *Rickert,* 188 U. S. 432 (1903), which upheld the right of the Government to seek injunctive relief against county taxation directed at improvements on and tools used to cultivate land allotted to and occupied by the Sioux Indians.   Of *Rickert,* the Court in *Heckman* stated:

> "But the decision [that the United States had the requisite interest] rested upon a broader foundation than the mere holding of a legal title to land in trust, and embraced the recognition of the interest of the United States in securing immunity to the Indians from taxation conflicting with the measures it had adopted for their protection." 224 U. S., at 441.

Here the United States could have made the same attack on the State's assertion of taxing power as was in

---

[12] H. R. Rep. No. 2040, 89th Cong., 2d Sess., 2–3 (1966).

fact made by the Tribe. *Heckman* v. *United States, supra.*[13] We think that the legislative history of § 1362, though by no means dispositive, suggests that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf. Since the United States is not barred by § 1341 from seeking to enjoin the enforcement of a state tax law, *Department of Employment* v.

---

[13] *Heckman* and *Rickert* were both cases in which the protection asserted by the United States on behalf of the Indians was grounded in the federal-instrumentality doctrine. Since *Mescalero*, as we have noted, effectively eliminated that doctrine as a basis for immunizing Indians from state taxation, there might appear to be a certain inconsistency in our reliance on *Heckman*. But the question of whether the United States has standing (*Heckman* used the term "capacity") to sue on behalf of others is analytically distinct from the question of whether the substantive theory on which it relies will prevail, and each is in turn separate from whether injunctive relief can issue at the United States' behest irrespective of § 1341. *Department of Employment*, see *supra*, at 470, and n. 10, did not hold that the United States had standing only in actions falling within the federal-instrumentality doctrine. Cases in the lower federal courts cited therein (385 U. S., at 358 n. 6), *e. g., United States* v. *Arlington County, Virginia,* 326 F. 2d 929, 931–933 (CA4 1964), and other cases from this Court, see *In re Debs,* 158 U. S. 564, 584 (1895); *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 284–286 (1888), indicate otherwise. The proper basis for the protection asserted here, of course, is not the federal-instrumentality doctrine eschewed in *Mescalero*, but is that which *McClanahan* identified, *i. e.,* that state taxing jurisdiction has been pre-empted by the applicable treaties and federal legislation. While not deciding what limits there are upon the United States' standing to sue absent enabling legislation, we conclude that the relationship between the United States and the Tribe—grounded in the Hell Gate Treaty and a century of subsequent legislation—would have established the former's standing to raise the pre-emption claim on behalf of the latter, and that an injunctive remedy to enforce that claim would not have been barred by § 1341.

*United States, supra,* we hold that the Tribe is not barred from doing so here.[14]

## III

In *McClanahan* this Court considered the question whether the State had the power to tax a reservation Indian, a Navajo, for income earned exclusively on the reservation. We there looked to the language of the Navajo treaty and the applicable federal statutes "which define the limits of state power." 411 U. S., at 172. Reading them against the "backdrop" of the Indian sovereignty doctrine, the Court concluded "that Arizona ha[d] exceeded its lawful authority" by imposing the tax at issue. *Id.,* at 173. In *Mescalero,* the companion case, the import of *McClanahan* was summarized:

"[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permit-

---

[14] The District Court went on to find jurisdiction over the individual Indian plaintiffs in both actions on the basis of 28 U. S. C. § 1343 (3), together with their allegation that these taxes deprived them of a right secured by the Commerce Clause. Noting that § 1362 by its terms goes only to an "Indian tribe or band," the State has argued that to hold § 1341 inapplicable merely because the state tax is attacked on constitutional grounds virtually strips it of force and is contrary to other federal-court decisions: *Bland* v. *McHann,* 463 F. 2d 21 (CA5 1972), cert. denied, 410 U. S. 966 (1973); *American Commuters Assn., Inc.* v. *Levitt,* 405 F. 2d 1148 (CA2 1969). Cf. *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 542 n. 6 (1972). The Tribe's brief does not discuss this aspect of the District Court's holding. We need not decide this question, however, since all of the substantive issues raised on appeal can be reached by deciding the claims of the Tribe alone, which did bring this action in the District Court under § 1362. See n. 7, *supra.* Cf. *California Bankers Assn.* v. *Shultz,* 416 U. S. 21 (1974). Any further proceedings with respect to refund claims by or on behalf of individual Indians, see n. 7, *supra,* would not appear to implicate § 1341.

ting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan* v. *Arizona State Tax Comm'n, supra,* lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent." 411 U. S., at 148.

Aligning itself with the dissenting opinion below, the State first seeks to avoid *McClanahan* on two grounds: (1) the manner in which the Flathead Reservation has developed to its present state distinguishes it from the Navajo Reservation; (2) there does exist a federal statutory basis permitting Montana to tax.

The State pointed below to a variety of factors: reservation Indians benefited from expenditures of state revenues for education, welfare, and other services, such as a sewer system; the Indians had the right to vote and to hold local and state office; and the Indian and non-Indian residents within the reservation were substantially integrated as a business and social community. The District Court also found, however, that the Federal Government "likewise made substantial payments for various purposes," and that the Tribe's own income contributed significantly to its economic well-being. 392 F. Supp., at 1314. Noting this Court's rejection of a substantially identical argument in *McClanahan,* see 411 U. S., at 173, and n. 12, and the fact that the Tribe, like the Navajos, had not abandoned its tribal organization, the District Court could not accept the State's proposition that the tribal members "are now so completely integrated with the non-Indians . . . that there is no longer any reason to accord them different treatment than other citizens." 392 F. Supp., at 1315. In view of the District Court's findings, we agree that there is no basis for distinguishing *McClanahan* on this ground.

As to the second ground, we note that the State does not challenge the District Court's overall conclusion that the treaty and statutes upon which the Tribe relies in asserting the lack of state taxing authority "are essentially the same as those involved in *McClanahan.*" [15] We agree, and it would serve no purpose to retrace our analysis in this respect in *McClanahan*, 411 U. S., at 173–179. The State instead argues that the District Court failed to properly consider the effect of the General Allotment Act of 1887, 24 Stat. 388, and a later enactment in 1904, 33 Stat. 302, applying that Act to the Flathead Reservation. Section 6 of the General Allotment Act, 24 Stat. 390, as amended, 25 U. S. C. § 349, provides in part:

> "At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee . . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside . . . ."

The State relies on *Goudy v. Meath*, 203 U. S. 146 (1906), where the Court, applying the above section, rejected the claim of an Indian patentee thereunder that state taxing jurisdiction was not among the "laws" to which he and his land had been made subject. Building on *Goudy* and the fact that the General Allotment Act has never been explicitly "repealed," the State claims that Congress has never intended to withdraw Montana's taxing jurisdiction, and that such power continues to the present.

---

[15] The quotation is taken from the first (unpublished) opinion of the District Court, Civ. No. 2145 (Mont., Oct. 10, 1973), Jurisdictional Statement, App. 73, 81 n. 9, the conclusions of which with respect to *McClanahan* were reaffirmed in the later opinions filed May 10, 1974, February 4, 1975, and March 19, 1975, published at 392 F. Supp. 1297, 1312; 392 F. Supp. 1325.

We find the argument untenable for several reasons. By its terms § 6 does not reach Indians residing or producing income from lands held in trust for the Tribe, which make up about one-half of the land area of the reservation. If the General Allotment Act itself establishes Montana's jurisdiction as to those Indians living on "fee patented" lands, then for *all* jurisdictional purposes—civil and criminal—the Flathead Reservation has been substantially diminished in size. A similar claim was made by the State in *Seymour* v. *Superintendent*, 368 U. S. 351 (1962), to which we responded:

> "[The] argument rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government." *Id.,* at 358.

We concluded that "[s]uch an impractical pattern of checkerboard jurisdiction," *ibid.,* was contrary to the intent embodied in the existing federal statutory law of Indian jurisdiction. See also *United States* v. *Mazurie,* 419 U. S. 544, 554–555 (1975).

The State's argument also overlooks what this Court has recently said of the present effect of the General Allotment Act and related legislation of that era:

> "Its policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished. Unallotted lands were made available to non-Indians

with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways. See § 6 of the General Allotment Act, 24 Stat. 390 . . . ." *Mattz* v. *Arnett,* 412 U. S. 481, 496 (1973).

"The policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, now amended and codified as 25 U. S. C. § 461 *et seq.*" *Id.,* at 496 n. 18.

The State has referred us to no decisional authority—and we know of none—giving the meaning for which it contends to § 6 of the General Allotment Act in the face of the many and complex intervening jurisdictional statutes directed at the reach of state law within reservation lands—statutes discussed, for example, in *McClanahan,* 411 U. S., at 173–179. See also *Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971). Congress by its more modern legislation has evinced a clear intent to eschew any such "checkerboard" approach within an existing Indian reservation, and our cases have in turn followed Congress' lead in this area.

A second, discrete claim advanced by the State is that the tax immunity extended by the District Court in applying federal law constitutes an invidious discrimination against non-Indians on the basis of race, contrary to the Due Process Clause of the Fifth Amendment. It is said that the Federal Government has forced this racially based exemption onto Montana so as to create a state statutory classification violative of the latter's duty under the Equal Protection Clause of the Fourteenth Amendment.

We need not dwell at length on this constitutional argument, for assuming that the State has standing to raise it on behalf of its non-Indian citizens and taxpayers,

we think it is foreclosed by our recent decision in *Morton* v. *Mancari,* 417 U. S. 535 (1974). In reviewing the variety of statutes and decisions according special treatment to Indian tribes and reservations, we stated, *id.,* at 552–555:

> "Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U. S. C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.
>
> .    .    .    .    .
>
> "On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment."

The test to be applied to these kinds of statutory preferences, which we said were neither "invidious" nor "racial" in character, governs here:

> "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.,* at 555.

For these reasons, the personal property tax on personal property located within the reservation; the vendor license fee sought to be applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land; and the cigarette sales tax, as applied to on-reservation sales by Indians to Indians,[16] conflict with

---

[16] The District Court noted two further distinctions within its ruling. It extended its holding to sales of cigarettes to Indians

the congressional statutes which provide the basis for decision with respect to such impositions. *McClanahan, supra; Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973).[17]

## IV

The Tribe would carry these cases significantly further than we have done, however, and urges that the State cannot impose its cigarette tax on sales by Indians to non-Indians because "[i]n simple terms, [the Indian retailer] has been taxed, and . . . has suffered a measurable out-of-pocket loss." But this claim ignores the District Court's finding that "it is the non-Indian consumer or user who saves the tax and reaps the benefit of the tax

---

living on the Flathead Reservation irrespective of their actual membership in the plaintiff Tribe. The State has not challenged this holding, and we therefore do not disturb it. Secondly, while recognizing that different rules may apply "where Indians have left the reservation and become assimilated into the general community," *McClanahan,* 411 U. S., at 171, the District Court on the present record did not decide whether the cigarette sales tax would apply to on-reservation sales to Indians who resided off the Flathead Reservation. That question, too, is therefore not before us.

[17] It is thus clear that the basis for the invalidity of these taxing measures, which we have found to be inconsistent with existing federal statutes, is the Supremacy Clause, U. S. Const., Art. VI, cl. 2, and not any automatic exemptions "as a matter of constitutional law" either under the Commerce Clause or the intergovernmental-immunity doctrine as laid down originally in *M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819). If so, then the basis for convening a three-judge court in this type of case has effectively disappeared, for this Court has expressly held that attacks on state statutes raising only Supremacy Clause invalidity do not fall within the scope of 28 U. S. C. § 2281. *Swift & Co.* v. *Wickham,* 382 U. S. 111 (1965). Here, however, the District Court properly convened a § 2281 court, because at the outset the Tribe's attack asserted unconstitutionality of these statutes under the Commerce Clause, a not insubstantial claim since *Mescalero* and *McClanahan* had not yet been decided. See *Goosby* v. *Osser,* 409 U. S. 512 (1973).

exemption." 392 F. Supp., at 1308. That finding necessarily follows from the Montana statute, which provides that the cigarette tax "shall be conclusively presumed to be [a] direct [tax] on the retail consumer precollected for the purpose of convenience and facility only." [18] Since nonpayment of the tax is a misdemeanor as to the retail purchaser,[19] the competitive advantage which the Indian seller doing business on tribal land enjoys over all other cigarette retailers, within and without the reservation, is dependent on the extent to which the non-Indian purchaser is willing to flout *his* legal obligation to pay the tax. Without the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked.

The Tribe asserts that to make the Indian retailer an "involuntary agent" for collection of taxes owed by non-Indians is a "gross interference with [its] freedom from state regulation," and cites *Warren Trading Post* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965), as controlling. However, that case involved a gross income tax imposed on the on-reservation sales by the trader to reservation Indians. Unlike the sales tax here, the tax was imposed directly on the seller, and, in contrast to the Tribe's claim, there was in *Warren* no claim that the State could not tax that portion of the receipts attributable to on-reservation sales to non-Indians. *Id.,* at 686 n. 1. Our conclusion in *Warren* that assessment and collection of that tax "would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations," *id.,* at 691, does not apply to the instant case.

---

[18] Mont. Rev. Code Ann. § 84–5606 (1) (1947).

[19] §§ 84–5606.18, 84–5606.31 (Supp. 1975).

The State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax. Since this burden is not, strictly speaking, a tax at all, it is not governed by the language of *Mescalero,* quoted *supra,* at 475–476, dealing with the "special area of state taxation." We see nothing in this burden which frustrates tribal self-government, see *Williams* v. *Lee,* 358 U. S. 217, 219–220 (1959), or runs afoul of any congressional enactment dealing with the affairs of reservation Indians, *United States* v. *McGowan,* 302 U. S. 535, 539 (1938): "Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments." See also *Thomas* v. *Gay,* 169 U. S. 264, 273 (1898). We therefore agree with the District Court that to the extent that the "smoke shops" sell to those upon whom the State has validly imposed a sales or excise tax with respect to the article sold, the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement thereof.

For the foregoing reasons, the judgments of the District Court are

*Affirmed.*