630 P.2d 1027

Stanley C. BATTESE and Kathy Battese, husband and wife, Appellees,

v.

APACHE COUNTY and Arizona Department of Revenue, Appellants.

No. 15328.

Supreme Court of Arizona, En Banc.

June 25, 1981.

Robert K. Corbin, Atty. Gen., by Ian A. Macpherson, Asst. Atty. Gen., Phoenix, for appellants.

Wayne H. Bladh, Window Rock, for appellees.

HAYS, Justice.

The State of Arizona appeals from cross-motions for summary judgment decided in favor of the Batteses. We are asked to uphold the ad valorem taxation by the State of two lots and improvements located within the boundaries of the Navajo Indian reservation and surrounded by Indian trust lands. These lots are owned in fee simple by the Batteses, both enrolled members of the Navajo tribe. We take jurisdiction pursuant to Rules of Civil Appellate Procedure, rule 19(e), 17A A.R.S., and affirm the judgment of the trial court.

The crux of the argument asserted by the State is based upon the chain of title of the Batteses' land. Originally, the Batteses' two lots (hereinafter subject property) were homesteaded by Thomas Osborne, a non-Indian. At that time, the subject property bordered the then existing Navajo Indian reservation, the boundaries of which were defined in the treaty of June 1, 1868 between the United States and the Navajo tribe. This treaty also recognizes the Navajo tribe as a self-governing Indian tribal organization. Osborne first filed for a homestead entry on the subject property on June 21, 1902. Not until November 6, 1908 did Osborne make final proof of his homestead entry, and on May 11, 1909 a patent to the property was finally issued by the United States Government. In the interim, on November 9, 1907, President Roosevelt issued Executive Order No. 709 which withdrew additional land surrounding the then existing reservation "from sale and settlement and set [it] apart for the use of the Indians ... *Provided*, That this withdrawal shall not affect any existing valid rights of any person."

In 1934 Congress further enlarged the Indian trust lands and established the exterior boundaries by the Act of June 14, 1934, ch. 521 § 1, 48 Stat. 960, to what is now the presently existing Navajo Indian Reservation of Arizona. This Act also provided that "[a]ll valid rights and claims initiated under the public land laws prior to the approval hereof involving any lands within the area so defined, shall not be affected by this Act." Section 2 of this 1934 Boundary Act authorized the owners of such property to relinquish or reconvey to the United States any portion of the property or to select lands outside the reservation in lieu of the property owned within the newly established reservation boundaries. The subject property was never relinquished nor reconveyed and was acquired by the Batteses through Osborne's successors in interest as evidenced by a joint tenancy deed dated October 30, 1975.

The State applies the relation-back doctrine in maintaining that the Osborne lands were effectively patented upon filing for a homestead entry in 1902, not in 1909, the date the patent was issued. The reservation expanded around the subject property and thus, the State asserts, the expansion of the reservation in 1907 and later in 1934 did not transform nor ever include Osborne's fee-patented lands as reservation trust lands since both Acts contained provisos to not affect any "existing valid rights," *i. e.*, Osborne's patent entry of 1902. The State concludes then that the subject property does not constitute a part of the reservation and therefore that no jurisdictional hurdle exists to halt the State's imposition of the ad valorem tax on the Batteses' real property located within the State. We are again confronted with marking the boundary between federal and state jurisdiction in resolving this taxation question.

For over 100 years the Supreme Court has adhered to the rule that States do not have authority to impose taxes on lands comprising Indian reservations. *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1867). Today the exemption of Indian *lands* and Indian income from state taxation is based upon the doctrine of federal preemption. *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Department of Revenue v. Hane Construction Co.*, 115 Ariz. 243, 564 P.2d 932 (App.1977). This doctrine has been consistently applied since the analysis was set forth in the *McClana-*

*han* decision and more recently has been construed by the United States Supreme Court in *Moe v. Confederated Salish & Kootenai Tribes, etc.*, 425 U.S. 463, 475–76, 96 S.Ct. 1634, 1642, 48 L.Ed.2d 96 (1976), stating:

"In *McClanahan* this Court considered the question whether the State had the power to tax a reservation Indian, a Navajo, for income earned exclusively on the reservation. We there looked to the language of the Navajo treaty and the applicable federal statutes 'which define the limits of state power.' 411 U.S., at 172, 93 S.Ct., at 1262, 36 L.Ed.2d, at 136. Reading them against the 'backdrop' of the Indian sovereignty doctrine, the Court concluded 'that Arizona ha[d] exceeded its lawful authority' by imposing the tax at issue. *Id.*, at 173, 93 S.Ct., at 1263, 36 L.Ed.2d, at 136. In *Mescalero*, the companion case, the import of *McClanahan* was summarized:

'[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation *lands* or Indian income from activities carried on *within the boundaries of the reservation*, and *McClanahan v. Arizona State Tax Commission, supra*, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent.' 411 U.S., at 148, 93 S.Ct., at 1270, 36 L.Ed.2d, at 119." (Emphasis added).

■ The State seeks to avoid the applicability of *McClanahan* and the many subsequently aligned decisions on the grounds that the original "non-Indian fee-patented" title removes this land from those being included within the term "Indian reservation lands," for tax exemption purposes. In our interpretation of the Navajo treaty, statutes, and relevant case law, we adhere to the rule of construction requiring that doubtful expressions be resolved in favor of the Indians. *McClanahan, supra.* The language used in the Acts and authorities mentioned to describe the lands which have been reserved to the Indians, and accordingly removed from state jurisdiction, includes "reservation lands," "Indian property," "property within the exterior boundaries of a reservation," "property within the limits of a reservation," and "Indian country," as defined in 18 U.S.C. § 1151(a)[1] for criminal jurisdictional purposes. We conclude that the Batteses' property comes within those lands Congress intended to be exempt from state taxation. We note, "[t]here is no magic in the word 'reservation.' " *Mescalero Apache Tribe v. Jones, supra*, 411 U.S. at 161, 93 S.Ct. at 1277 (Douglas, J., concurring and dissenting in part). The relevant cases which have applied the *McClanahan* analysis, discussed *infra*, exemplify the position that the property's status as trust, nontrust, and/or fee-patented land, is not determinative of the property's status as exempt from state taxation. The exemption applies if the subject property is owned by enrolled Navajo tribal members and is located within the present physical boundaries of the Navajo reservation.

■ In summary, the United States Supreme Court cases illustrate the frustration of State attempts to tax property owned *in fee* by reservation Indians. Personal income derived from reservation sources and earned by reservation Indians cannot be taxed by the State, *McClanahan, supra* ; personal property taxes cannot be imposed upon motor vehicles owned by such Indians, nor can cigarette taxes be levied on sales made on the reservation to reservation Indi-

---

1. "§ 1151. Indian country defined

"Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, *notwithstanding the issuance of any patent*, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." (Emphasis added).

ans, *Moe v. Confederated Salish & Kootenai Tribes, supra.*

Under some circumstances, even conduct of *non*-Indians on the reservation is governed by tribal and not state laws, *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). But the decisions which find no exemption from state taxation or exclusion from state authority are readily distinguishable. They involve non-Indians and focus on the degree of the burden imposed by the State and its interference with tribal self-government. The burden was held to be minimal in *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), where the State taxed cigarette sales of on-reservation purchases made by *non-members* of the tribes.

Two recent decisions by the United States Supreme Court further stress the significance of the Indian or non-Indian status of the individual taxed. *Central Machinery Co. v. Arizona State Tax Commission*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). In *White Mountain Apache Tribe v. Bracker*, 100 S.Ct. at 2584, the Court reaffirmed that when on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's generalized interest in raising revenue is insufficient to permit intrusion of the federal interest in encouraging self-government. In the instant case we are dealing with the Batteses, tribally enrolled Indians who share in the aspects of self-government upon which the tradition of immunity is based. The State's interest in ad valorem property taxation for revenue purposes is not a sufficient interest to justify intrusion.

The United States Supreme Court's recent pronouncement discussing the conflict of tribal and state authority does not provide the purported support for the State's interpretation of reservation lands. A question before the Court in *Montana v. United States*, 50 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), was whether the tribe had the power to regulate *non-In-dian* fishing and hunting on *reservation land* owned in fee by *nonmembers* of the tribe. The Court upheld regulation by the tribe on land belonging to the tribe or held by the United States in trust but was not presented with the question of regulation over reservation land owned in fee by *Indians.* Where the tribe attempted to regulate land no longer owned by it, the court found no relation to tribal self-government or internal relations. As repeatedly mentioned, we are here dealing with the ownership of land by two tribal Indians. The Batteses own land in fee located inside the Navajo reservation boundaries which were established and set apart by Federal Acts which by their terms limit State jurisdiction. The exempt tax status of the Batteses' property comes "... within the sphere which the relevant treaty and statutes leave for the Federal Government and for the Indians themselves." *McClanahan*, 411 U.S. at 179–80, 93 S.Ct. at 1266. As yet, Congress has not consented to state taxation of Indian property located on a reservation. An examination of the applicable Navajo treaties and statutes has been conducted, is fully set forth in *McClanahan, supra*, and a complete reiteration is unnecessary. None of these clearly express an intent to discontinue the tax-exempt status of the subject property.

Executive Order 709's proviso that the "existing valid rights of any person" shall not be affected by the Act does not, as the State maintains, authorize taxation of the subject property. In *Francisco v. State*, 113 Ariz. 427, 430, 556 P.2d 1, 4 (1976), we construed a similar proviso contained in Arizona's Enabling Act as disclaiming "... only the state's proprietary interest in Indian lands and not its governmental interest therein. (citation omitted) ... At the same time, however, we note that the Act can not be read to sanction such an exercise of the state's jurisdiction in this case." This proviso was intended to protect the proprietary interests of those individuals, *i. e.*, Osborne, who, for instance, had already applied for a patent which upon full compliance with the Land Laws would ripen into a title. *Stockley v. United States*, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923). The

Enabling Act's language, when read to resolve all doubt in favor of the Indians, does not confer jurisdiction upon the State to tax the subject property and does not supersede the congressionally recognized tax exemption of property located inside reservation borders.

As the United States Supreme Court explained in its analysis of the Arizona Enabling Act in *McClanahan,* 411 U.S. at 175–76, 93 S.Ct. at 1264,

> "Nor is the Arizona Enabling Act silent on the specific question of tax immunity. The Act expressly provides that 'nothing herein, or in the ordinance herein provided for, shall preclude the said State from taxing as other lands and other property are taxed any lands and other property *outside of an Indian reservation* owned or held by any Indian.' *Id.,* at 570 (emphasis added). It is true, of course, that exemptions from tax laws should, as a general rule, be clearly expressed. But we have in the past construed language for more ambiguous than this as providing a tax exemption for Indians. See, *e. g., Squire v. Capoeman,* 351 U.S. 1, 6, 76 S.Ct. 611, 614, 100 L.Ed. 883 (1956), and we see no reason to give this language an especially crabbed or restrictive meaning."

*McClanahan* is further characterized in *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112–13, 48 L.Ed.2d 710 (1976), as establishing a rule against finding that "... ambiguous statutes abolish by implication Indian tax immunities." The meaning of the words "outside of an Indian reservation" in Arizona's Enabling Act can be fairly interpreted to include the subject property as tax-exempt reservation lands since this property is located within the periphery of the Navajo reservation boundaries.

The State urges us to find that this fee-patented land is an "island" within a "sea" of Indian trust reservation lands and is therefore "outside" the Indian reservation as described in the Enabling Act. Reliance is placed upon an unpublished United States District Court decision which held fee-patented lands to not constitute part of a res-ervation, *Salt River Pima-Maricopa Indian Community v. City of Scottsdale, et al.,* 353 F.Supp. 1098 (D.Ariz.1976). 560 acres of land were patented to a non-Indian, and subsequently the boundaries of the Salt River Pima-Maricopa Indian Community were expanded around it by Executive Order. It is crucial to note that this case is not dispositive because the 560 acres are *not* owned by *Indians.*

An additional indicator that the traditional tax immunity of Indian lands, and here of the subject property, has not been altered is evident in the fact that Arizona has not complied with 25 U.S.C. § 1322(a). This statute permits states to assume civil and criminal jurisdiction over Indian reservations and to disregard enabling acts which limit their authority over such Indians by complying with this statute. Arizona has not amended its constitution nor obtained consent of the Navajo tribe to assume jurisdiction over their affairs, pursuant to this section.

In conclusion we note an argument raised at considerable length in the briefs but which we need not resolve due to our determination that the status of the Batteses as enrolled members of the Navajo tribe and their ownership of the subject property, located within the exterior boundaries of the reservation, precludes the State from imposing an ad valorem tax on such property. The argument posed was whether the definition of "Indian country" contained in chapter 53, dealing with crimes involving Indians, of 18 U.S.C. § 1151(a), should be applied in this civil case to determine what lands are exempted from taxation. This definition is used in the context of federal preemption of state jurisdiction over crimes committed on Indian country. If the fee-patented property owned by the Batteses was found to be embodied in the definition of "Indian country," the State would lack jurisdiction to tax the subject property.

The only United States Supreme Court decision which, arguably in dicta, discusses the applicability of this definition to civil matters is *DeCoteau v. District County for the 10th Judicial District,* 420 U.S. 425, 95

S.Ct. 1082, 43 L.Ed.2d 300 (1975). The Court specifically noted (footnote 2, 420 U.S. at 427, 95 S.Ct. at 1084) that while 18 U.S.C. § 1151 was concerned on its face only with criminal jurisdiction, "... [t]he Court has recognized that it generally applies as well to questions of civil jurisdiction." (Citing footnotes in *McClanahan, supra, Williams, supra,* and *Kennerly v. District Court of the Ninth Judicial District of Montana,* 400 U.S. 423, 424, n.1, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971)). *DeCoteau, supra,* consolidated a civil and criminal claim, based upon acts which occurred in an area consisting of a checkerboard arrangement of trust land allotments and non-Indian-owned fee land encompassed within a line declared in a treaty of 1867 to be the exterior boundary of the Lake Traverse Indian Reservation. The acts giving rise to the proceedings were committed on a non-Indian-owned parcel of land. The jurisdictional status of this land located within the 1867 reservation boundaries was at issue. *DeCoteau, supra,* involved reservation land purchased from the United States by non-Indian settlers and the land on which the events took place is still inhabited by non-Indians. The considerations when Indian-owned land is at issue differs as has been emphasized in the text of this opinion. We have limited our decision to the facts presented before us—Indian ownership of fee-patented land located within reservation boundaries.

We further find it unnecessary to decide whether the subject property may exist as part of a permissible civil jurisdictional checkerboard [2] within reservation boundaries as urged by the State.

Affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and CAMERON and GORDON, JJ., concur.

---

2. Checkerboard jurisdiction describes the situation where the ownership of particular parcels of land with proclaimed reservation boundaries determines whether or not the parcel constitutes Indian reservation lands and therefore whether or not federal jurisdiction over each of the distinct parcels exists. See discussion in *Moe v. Confederated Salish & Kootenai Tribes, etc.,* 425 U.S. at 478, 96 S.Ct. at 1643–44.