NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0607n.06

No. 15-2442

**FILED**
Nov 17, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES P. PAGE, individually and in a representative capacity, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN AT DETROIT |
| v. | ) ) | |
| CITY OF WYANDOTTE, MI, et al., | ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE:     COLE, Chief Judge; BATCHELDER and COOK, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.**  Plaintiff James Page resides in the City of Wyandotte, Michigan, and receives water and cable services from City-owned utilities.  Page sued the City, the City's mayor, and the City Council in state court, challenging the City's collection of water and cable franchise fees from its water and cable customers.  The City removed the case to federal court, citing Page's federal constitutional claims.  But Page moved to remand, arguing that, because the franchise fees are taxes, the Tax Injunction Act deprived the federal court of subject matter jurisdiction.  The district court denied the motion to remand with respect to Page's federal claims, proceeding to dismiss the complaint under Federal Rule of Civil Procedure 12(c).  We agree with Page that the Tax Injunction Act deprived the district court of jurisdiction to hear Page's case.  Accordingly, we must VACATE the district court's opinion and REMAND so that the district court may remand the case to state court.

## I.  FACTS AND PROCEDURAL HISTORY

The City of Wyandotte provides water, cable television, and internet services to its residents through Wyandotte Municipal Services (WMS), a department of the City, and WMS Cable, a subdepartment.  This lawsuit concerns annual transfers of large sums of money from WMS and WMS Cable to the City's General Fund.  These transfers are labeled the "cable franchise fee" and the "water franchise fee."  A feature of "enterprise fund accounting," these transfers "reimburse the City for the cost of providing [City] services," including police and fire protection and certain administrative services, to WMS.[1]

*Cable Franchise Fee.*  The cable franchise fee has existed since the City first began to provide cable service in 1983.  Initially, WMS Cable annually transferred five percent of its gross revenue to the City's General Fund.  In 2005, by a City Council resolution, the City raised the cable franchise fee from five percent to eight percent of WMS Cable's gross revenue.

Two years later, the City Council authorized the City's mayor to execute a Uniform Video Service Local Franchise Agreement between the City and WMS Cable.  This Franchise Agreement grants WMS Cable the right to use and occupy the public right-of-way in exchange for payment of a "provider fee"—a new cable franchise fee—equal to five percent of WMS Cable's gross revenue.  This new fee replaced the eight percent fee.

Up to this point, the cable franchise fee had not been itemized on customers' bills.  This changed in October 2011, when the City began listing the cable franchise fee on customers' cable bills as a separate charge.  At the same time, the City implemented an additional increase in its rates for cable service.

---

[1] The City administrator, Todd Drysdale, calls these fees "payments in lieu of tax," or PILOTs.

*Water Franchise Fee.* The City first implemented the water franchise fee in fiscal year 2008, the same year that the City reduced the cable franchise fee from 8% to 5% of gross cable revenues. Unlike the cable franchise fee, the water franchise fee is an annual transfer of a fixed sum of $200,000, and it is not noted separately on customers' bills.

Page sued the City, its mayor, and its City Council in state court, alleging that these transfers violate the United States Constitution, the Michigan Constitution, and the City Charter, and alleging various other common law grounds for relief. He sought certification as a class action, a declaratory judgment, an injunction, damages, and attorney fees. When the defendants removed the case to federal court, Page filed a motion to remand, arguing that the Tax Injunction Act divested the federal court of subject matter jurisdiction.

The district court granted the motion only in part but ignored Page's Tax Injunction Act argument. Noting simply that it had federal question jurisdiction over the federal constitutional claims, the district court concluded that this was sufficient for it to exercise jurisdiction. The court declined to exercise supplemental jurisdiction over Page's state law claims, and it remanded those claims to the state court. Page filed a motion for reconsideration, but the district court did not clarify its reasoning. *See Page v. City of Wyandotte*, No. 15-cv-10575, 2015 WL 3646315, *2 (E.D. Mich. June 10, 2015). The district court later granted the defendants' motion to dismiss the federal claims under Rule 12(c). *Page v. City of Wyandotte*, No. 15-cv-10575, 2015 WL 6164004 (E.D. Mich. Oct. 20, 2015).

Page now appeals the denial of his motion to remand and the dismissal of his claims. We review de novo. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006).

**II. ANALYSIS**

The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. This statute creates a "broad jurisdictional barrier" that "limit[s] drastically federal district court jurisdiction to interfere with . . . the collection of [state and local] taxes." *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 825–26 (1997) (quoting *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470 (1976); *California v. Grace Brethren Church*, 457 U.S. 393, 408–09 (1982)). Its core purpose is to "shield[] state tax collections from federal-court restraints." *Hibbs v. Winn*, 542 U.S. 88, 104 (2004).

Page seeks to enjoin the City's collection of franchise fees, and the parties do not dispute that Michigan state courts provide a "plain, speedy and efficient remedy" for any meritorious claims. Therefore, if the franchise fees are "tax[es]" within the meaning of the Act, the Act bars federal jurisdiction. This is true regardless of whether another basis for federal jurisdiction would otherwise apply. *See Grace Brethren*, 457 U.S. at 408 (holding that the TIA "prohibits a district court from issuing a declaratory judgment holding state tax laws unconstitutional"). The district court erred in concluding otherwise. Whether or not the fees are taxes under Michigan law, "the definition of the term 'tax'" in the Tax Injunction Act "is a question of federal law." *Hedgepeth v. Tennessee*, 215 F.3d 608, 612 (6th Cir. 2000).

We consider three factors when determining whether a state regulatory assessment is a tax for purposes of the Tax Injunction Act: (1) what entity imposes the assessment; (2) who pays

it; and (3) the revenue's ultimate use.[2]  *Id.*  The goal of this analysis is to determine "whether the assessment in question is for revenue[-]raising purposes"—a tax—"or merely a regulatory or punitive . . . fee."  *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 837 (6th Cir. 1999) (quoting *Wright v. McClain*, 835 F.2d 143, 145 (6th Cir. 1987)).  When the factors point in different directions, the third factor is determinative.  *Id.* at 838.

Here, the first factor suggests that the fees are taxes: The Wyandotte City Council itself authorized both franchise fees.  "An assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency."  *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996) (citing *San Juan*, 967 F.2d at 685).

But the second factor cuts in the opposite direction.  It is true, as Page argues, that "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class."  *Bidart Bros.*, 73 F.3d at 931.  *Cf. GenOn Mid-Atlantic, LLC v. Montgomery Cnty.*, 650 F.3d 1021, 1025 (4th Cir. 2011) (holding that an exaction that targets a single taxpayer is a punitive fee rather than a tax).  And since any City resident who receives the City's water or cable utility service is subject to the franchise fees, they are certainly paid by a large number of persons.  But the class of persons who pay each franchise fee is actually narrowly focused, including only those who voluntarily receive the respective utility service.  A fee for service is not a tax.  *See, e.g.*, *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th

---

[2] Several other circuits use this same three-factor approach.  *GenOn Mid-Atlantic, LLC v. Montgomery Cnty.*, 650 F.3d 1021, 1023 (4th Cir. 2011); *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000); *Hexom v. Ore. Dep't of Transp.*, 177 F.3d 1134, 1137 (9th Cir. 1999); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992).  *But see Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 737 F.3d 228, 231 (2d Cir. 2013) (looking solely to the purpose of the revenue to determine whether an assessment is a tax); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 728, 730 (7th Cir. 2011) (en banc) (rejecting the three-factor test in concluding that an exaction on casinos was a tax because it was designed to generate revenue, not to punish (a fine) or to compensate the state for a service (a fee)).

Cir. 1998) (holding that a municipal fire service protection fee was a tax since it "was based upon a resident's property owner status instead of his use of the city service").

We therefore turn to the third factor, "whether the assessment is expended for general public purposes" or only for the benefit of those who pay the fee. *Hedgepeth*, 215 F.3d at 612 (quoting *Am. Landfill*, 166 F.3d at 837). The revenue's use strongly indicates the purpose of the assessment: "[w]hen the ultimate use is to provide a general public benefit, the assessment is likely a tax, while an assessment that provides a more narrow benefit to the [payees] is likely a fee." *Am. Landfill*, 166 F.3d at 838.

Our decision in *Hedgepeth* is instructive. There we considered whether assessments for new and renewed disabled parking placards were taxes or regulatory fees. 215 F.3d at 611. Because the assessments were imposed by the state but collected only from individuals needing a disabled parking permit, the analysis ultimately came down to the revenue's use. We held that, because the revenue went into various funds, including the state highway fund and the general fund, the assessments were taxes.[3] *Id.* at 612–13. The renewal fee raised revenue approximately one-and-a-half times the cost of the program, and the record revealed a "substantial difference between the actual cost of the permanent placard or license plate and the amount that must be paid to obtain one." *Id.* at 613–14. We distinguished cases from other circuits in which the disability permit fee was only high enough to cover the costs of the program. *See Hexom v. Ore. Dep't of Transp.*, 177 F.3d 1134, 1139 (9th Cir. 1999); *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1312 (10th Cir. 1999); *see also Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir.

---

[3] Of course, whether or not the revenue is placed in a separate fund is not dispositive either way. *See, e.g.*, *Am. Landfill*, 166 F.3d at 839 (holding that certain assessments on solid waste disposal were taxes because the money was "placed in a fund that, while separate from the general fund, serve[d] public purposes benefitting the entire community").

2000) (holding that a disabled parking permit fee, whose only purpose was to pay for the cost of the program, was not a tax).

Here, the City claims that the franchise fees "are not for the purpose of providing general revenue to the City," but that they reimburse the City for services provided to the utilities, and by extension, the utility customers. Yet those "services" provided to the utilities are in fact the same services provided to all City residents: police protection, fire protection, and the services of the Department of Public Works. The City makes no attempt to correlate the amounts of the franchise fees with the costs of providing these services to WMS and WMS Cable. *See City of Chattanooga v. BellSouth Telecomm., Inc.*, 1 F. Supp. 2d 809, 813 (E.D. Tenn. 1998) (holding that a utility franchise fee was a tax because "the City [] made no effort to relate the franchise fee to its costs in maintaining its rights of way," indicating "that it would be used to pay the City's general debts and obligations"). And the substitution of a new water franchise fee for a portion of the cable franchise fee in fiscal year 2008 further supports our conclusion that the City imposed these fees for the purpose of raising revenue.

Even if the City could somehow demonstrate that the revenue from the franchise fees covered the portion of the cost of providing City services that is attributable to the utilities, we are still convinced that the franchise fees would be taxes within the meaning of the Act. The City maintains its roads and provides police and fire protection regardless of how many customers subscribe to the City's cable or hook up to its water line. And municipalities do not charge a fee-for-service to fund the police and fire departments; they impose levies, i.e., *taxes*. The franchise fees may be a clever way to surreptitiously increase the City's coffers, but we are convinced that this alternate stream of revenue is nonetheless *tax* revenue. The Tax Injunction

Act therefore bars federal court jurisdiction over Page's attempt to "enjoin, suspend or restrain" that revenue stream.

## III. CONCLUSION

We therefore VACATE the judgment of the district court and REMAND to the district court with instructions that the case be remanded to state court.

COLE, Chief Judge, dissenting.  Wyandotte Municipal Services ("WMS"), a separate entity created under the laws of the State of Michigan and Charter of the City of Wyandotte, **[Answer, R. 2, PageID 119−20 ¶¶ 9−10]** charges cable and water subscribers a "franchise fee" for the privilege of using those utilities.  Unlike the majority, I believe that despite the fact that the City authorized the fee and that it is used for some common city services, WMS's franchise fees clearly constitute a regulatory fee rather than a tax.  I therefore conclude that the Tax Injunction Act presents no bar to federal court jurisdiction, and I respectfully dissent from the majority's holding to the contrary.

The district court erred in failing to first determine whether the Tax Injunction Act, 28 U.S.C. § 1341, divested it of jurisdiction.  As the majority correctly states, this was required before proceeding to any of Page's other claims.  (Maj. Op. at 4.)  Courts consider three factors in determining whether a charge is a fee or a tax: (1) what entity imposes the assessment; (2) who pays it; and (3) the revenue's ultimate use.  *Hedgepeth v. Tennessee*, 215 F.3d 608, 612 (6th Cir. 2000).

*(1) What entity imposes the assessment*.  The majority finds that the first factor suggests the franchise fees are taxes because "the Wyandotte City Council itself authorized both franchise fees." (Maj. Op. at 5.)  However, *authorization* of a fee and *imposition* of a fee are two different things.  The City entered into a contract with WMS to provide Wyandotte citizens with water and cable services.  The contract was entered into pursuant to Michigan law, which requires "utility providers to (a) obtain a franchise from a municipality before transacting business within its city limits and (b) secure the municipality's consent before using municipal highways, streets, alleys or other public places for locating and operating utility equipment and facilities." (Compl., R. 1, PageID 13 ¶ 11 (citing Mich. Const. Art. VII § 29).)  That contract provided for a

franchise fee to be charged to WMS for the expenses it would cost the City. The fee here was not "imposed directly by the legislature" on the public. *See Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996). Instead, the fee was imposed on WMS by the City. **[Compl., R. 1, PageID 15−16 ¶ 29.]** WMS—not the City—in turn charged its customers the franchise fee.

*(2) Who pays the fee.* I agree with the majority's conclusion that the second factor suggests the franchise fees are indeed fees, and not taxes, because they are only paid by those who "voluntarily receive the respective utility service." (Maj. Op. at 6.)

*(3) The revenue's ultimate use.* The majority finds that the third factor suggests the franchise fees are taxes because they were imposed to cover "the same services provided to all City residents: police protection, fire protection, and the services of the Department of Public Works." (Maj. Op. at 7.) While this is true, the fee covers more than that. Under Michigan law, a "'franchise fee' is an amount that is paid by a utility provider to a municipality in exchange for the right to serve its citizens and to occupy and use municipally-owned highways, streets, alleys and other public spaces to install, operate, and maintain the infrastructure necessary to provide that service." (Compl., R. 1, PageID 13 ¶ 12.) Specifically, the franchise fee here also covers expenses such as "occupancy of space in City buildings . . . accounting [and] information technology services," (Page Br. at 17), and "certain administrative services provided by other City employees." (Drysdale Aff., R. 12-1, PageID 353 ¶ 6.)

The franchise fees paid to the City are "intended to reimburse the City for the cost of providing services to [] WMS and are not intended to be transferred to or expended from the General Fund for any other purpose than providing services to WMS." (*Id.* at PageID 352 ¶ 5.) These are services that any other private utilities provider would be required to pay. Further,

these services benefit WMS's voluntary subscribers, not the general public. Indeed, the franchise fees ensure that City residents who are not subscribers do not end up subsidizing WMS's customers.

The majority also finds that "[t]he City makes no attempt to correlate the amounts of the franchise fees with the costs of providing these services to WMS and WMS Cable." (Maj. Op. at 7.) I respectfully disagree. While Page argues that the franchise fee correlates with a fee the City used to charge and that the amount WMS transfers to the City's general fund has increased over the years, this is not *evidence* that the transfers do not correlate to actual City expenses. Undoubtedly, these costs have increased over time, inflation has occurred, and private water and cable providers would reflect the same increases. In opposition to Page's bare assertions, the City represented that it uses "enterprise fund accounting" to "ensure that revenue is properly tracked and that the portions of the total costs of a service that is recovered through user charges and the portion that is subsidized (if any) are able to be analyzed and evaluated." (City Br. at 11; *see also* Drysdale Aff., R. 12-1, PageID 353 ¶¶ 7−9.) In any event, municipalities are not required to "precisely calibrate[]" "the amount of a user fee . . . to the use that a party makes of Government services." *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989). Instead, the Supreme Court has held that user fees need only be a "fair approximation of the cost of benefits supplied." *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 463 n.19 (1978)). Here, the City's enterprise fund accounting provides that "fair approximation" because the City only transfers funds into the general fund to reimburse the City for services it provides to WMS. **[Drysdale Aff., R. 12-1, PageID 353 ¶¶ 8−9.]**

\* \* \*

Accordingly, I would conclude that WMS's cable and water franchise fees are indeed fees and not taxes. The Tax Injunction Act, therefore, is not implicated and the district court had jurisdiction. I would affirm the remainder of the district court's decision based on the reasons stated in its opinion.

\* \* \*