[No. E051027. Fourth Dist., Div. Two. July 13, 2011.]

THE PEOPLE ex rel. KAMALA D. HARRIS, as Attorney General, etc.,
Plaintiff and Respondent, v.
BLACK HAWK TOBACCO, INC., et al., Defendants and Appellants.

**COUNSEL**

Fredericks Peebles & Morgan and Michael A. Robinson for Defendants and Appellants.

Kamala D. Harris, Attorney General, Karen Leaf, Dennis Eckhart and Michelle Hickerson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CODRINGTON, J.—**

### I

### INTRODUCTION

The superior court granted a preliminary injunction prohibiting defendants and appellants Black Hawk Tobacco, Inc. (Black Hawk), and Frederick Allen McAllister (McAllister) from selling cigarettes to non-Indians in violation of state and federal laws. Black Hawk and McAllister appeal from the order granting the injunction. (Code Civ. Proc., § 904.1, subd. (a)(6).)

On appeal, defendants argue that the State of California cannot regulate defendants' sale of cigarettes to non-Indians because defendants are operating stores located on trust lands held by the United States for the Agua Caliente Band of Cahuilla Indians (the Band), a federally recognized tribe. We reject this argument and hold the superior court did not abuse its discretion in granting the preliminary injunction against defendants.

### II

### FACTUAL AND PROCEDURAL BACKGROUND

McAllister is an enrolled member of the Sac and Fox Nation, a federally recognized Indian tribe from Oklahoma. McAllister is the sole owner of Black

Hawk, a California corporation. Black Hawk was also incorporated in June 2008 under the laws of the Sac and Fox Nation.

The Band is a federally recognized tribe,[1] located in eastern Riverside County. In 1985, the Band adopted an ordinance, section 4.04.010, governing retail cigarette sales on the reservation, providing in part: "Until the Tribal Council directs otherwise, the sale of cigarettes (as defined in the California Revenue & Taxation Code § 30003) by all individual sellers, including members of the Agua Caliente Band of Cahuilla Indians, members of other tribes, corporations, partnerships, joint ventures, and all other entities, is prohibited on the trust lands of the Agua Caliente Indian Reservation, except for (1) cigarettes sold in full compliance with the California Cigarette Tax Law (California Revenue & Taxation Code § 30001 et seq.), including payment of the tax imposed on the distribution by that state law; and (2) cigarettes sold to Indians on the Agua Caliente Indian Reservation."

For several years, Black Hawk operated four "brick and mortar" stores in Palm Springs and Cathedral City, all located on Indian trust land within the boundaries of the Band's reservation.[2] The State Board of Equalization issued a cigarette and tobacco products retailer's license to McAllister for all four locations. Black Hawk also operated an online Web site and mail-order store from one of the Palm Springs locations.

The Attorney General on behalf of the People of the State of California (the People) filed a complaint against defendants, alleging five causes of action for unlawful business practices (Bus. & Prof. Code, § 17200), including the first cause of action for violation of the state tobacco directory law by selling cigarettes not listed in the directory (Rev. & Tax. Code, § 30165.1, subds. (e), (f)); the second cause of action for violation of the California Cigarette Fire Safety and Firefighter Protection Act (Health & Saf. Code, §§ 14950–14960); and the fifth cause of action for violation of the federal Contraband Cigarette Trafficking Act (CCTA) (18 U.S.C. § 2341 et seq.).[3] The People sought a preliminary injunction, enjoining defendants from the foregoing violations, particularly the sale of cigarettes to non-Indians.

---

[1] As of December 2009, the Band had 427 enrolled members, including 291 adults.

[2] The Band holds "a total of 26,646.28 acres in the area of Palm Springs, California. These lands are interspersed among non-Indian lands in a checkerboard pattern. The legal title to them is in the United States in trust." (*Agua Caliente Band of Mission Indians v. County of Riverside* (9th Cir. 1971) 442 F.2d 1184, 1185.) "[I]n the case of the Agua Calientes some 34,000 acres were allotted to them in the form of alternate square mile parcels forming a checkerboard of Indian lands, the intervening square mile areas remaining in non-Indian ownership." (*Agua Caliente Band of Mission Indians' Tribal Council v. City of Palm Springs* (C.D.Cal. 1972) 347 F.Supp. 42, 47.)

[3] The third and fourth causes of action, involving remote sales of cigarettes, were not grounds for the preliminary injunction. (Rev. & Tax. Code, § 30101.7; Bus. & Prof. Code, § 22963.)

Defendants removed the case to federal court, which promptly remanded the case back to the superior court.

Defendants then filed a motion to quash or dismiss the complaint and a demurrer or motion to strike, all asserting jurisdictional challenges. Defendants argued that the directory statute and the cigarette fire safety act are not enforceable against sales occurring on the Band's reservation. Defendants also argued that the federal CCTA cannot be enforced by a state agency and that none of the state laws apply on the reservation because of tribal sovereignty and because states cannot regulate Indians in Indian country without congressional consent. Defendants additionally argued that the People's claims are preempted by federal law.

The trial court overruled the demurrer and denied the motion to quash, ruling that tribal sovereignty does not apply because defendants are not members of the Agua Caliente tribe. (*Washington v. Confederated Tribes* (1980) 447 U.S. 134, 161 [65 L.Ed.2d 10, 100 S.Ct. 2069] (*Washington*).) The court also found that federal preemption did not operate and that state laws apply to regulate sales of cigarettes to non-Indians on tribal lands. (*New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 333–335 [76 L.Ed.2d 611, 103 S.Ct. 2378]; *Moe v. Salish & Kootenai Tribes* (1976) 425 U.S. 463, 482–483 [48 L.Ed.2d 96, 96 S.Ct. 1634] (*Moe*).) Furthermore, the People's claims against defendants were mainly based on violations of the California cigarette tax laws and not only on violations of the CCTA.

Defendants subsequently filed additional opposition to the motion for a preliminary injunction on the grounds that Black Hawk would suffer irreparable harm if the injunction was granted, causing Black Hawk to cease operations and fire 30 employees. Defendants also contended the People could not establish the likelihood of success because the CCTA claim was barred and the other claims violated the Indian commerce clause. Black Hawk then volunteered to cease all operations, contending the motion for an injunction was moot.

As of February 17, 2010, the tribal council confirmed the ordinance, section 4.04.010, was in full force and effect: ". . . the Tribe interprets its law to mean that all tobacco sellers on the Reservation must abide by *all* laws related to cigarette sales, regardless of where in the California Codes they may be located, including the Directory statute and the Cigarette Fire-Safety Law." The tribal council expressed its view that "Black Hawk's continued illegal sale of cigarettes on the Reservation is contrary to Tribal law."

On March 26, 2010, the court concluded the motion for an injunction was not moot. The court granted the preliminary injunction and issued a written

ruling prohibiting defendants from selling off-directory, non-fire-safe-certified, "untaxed cigarettes except for sales" to enrolled members of any federally recognized tribe of California. Black Hawk could also sell unstamped, untaxed packs of cigarettes to registered members of any federally recognized tribe of California on any Indian reservation in the state other than the Band's reservation.

Defendants filed a timely notice of appeal.

## III

## DISCUSSION

Defendants admit selling "off-directory, non-fire-safe-certified," untaxed cigarettes. Defendants contend they are entitled to do so because Black Hawk is a Sac and Fox Nation corporation, owned by McAllister, an enrolled Sac and Fox Indian, and doing business on the Band's reservation. On appeal, defendants have disregarded the usual two-part analysis for deciding whether it was an abuse of discretion to grant an injunction. They also abandon their arguments about federal preemption. Instead, they assert a new argument that the State of California has no right to regulate tobacco sales on the Band's reservation because the Band has the exclusive authority to regulate tobacco sales on the reservation.

### A. *General Principles of Review*

The trial court did not abuse its discretion in granting the preliminary injunction if the People established the likelihood of success and defendants did not provide evidence of grave or irreparable harm. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 72 [196 Cal.Rptr. 715, 672 P.2d 121].)

"A trial court abuses its discretion when its decision exceeds the bounds of reason by being arbitrary, capricious or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) In determining whether there has been such an abuse, we cannot reweigh evidence or pass upon witness credibility. The trial court is the sole arbiter of such conflicts. Our role is to interpret the facts and to make all reasonable inferences in support of the order issued. [Citation.]" (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1420 [130 Cal.Rptr.2d 385] [Fourth Dist., Div. Two]; see *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].)

■ "Trial courts traditionally consider and weigh two factors in determining whether to issue a preliminary injunction. They are (1) how likely it is

that the moving party will prevail on the merits, and (2) the relative harm the parties will suffer in the interim due to the issuance or nonissuance of the injunction. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1449 [125 Cal.Rptr.2d 277] (*Whyte*).)" (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley, supra,* 105 Cal.App.4th at p. 1420; see *Weingand v. Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820 [83 Cal.Rptr. 650, 464 P.2d 106].)

B. *Likelihood of Success*

■ The unfair competition law, proscribing any unlawful business practice, provides broad authority for an injunction. (Bus. & Prof. Code, §§ 17200 et seq., 17203; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) Express authority for injunctive relief is provided by the California Cigarette Fire Safety and Firefighter Protection Act. (Health & Saf. Code, § 14955, subd. (f).) Defendants admitted their cigarette sales did not comply with state and federal law. As elaborated in the following analysis, it is reasonably probable that the People will prevail on the merits.

Defendants argue on appeal the People cannot establish likelihood of success because the Band, not California, possesses the exclusive authority to regulate tobacco sales on the reservation. In other words, only the Band, not the state, can legally enforce reservation tobacco regulation. We reject this entirely new theory, raised for the first time on appeal. (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758].) We reiterate that the People are likely to succeed on their claims and the trial court did not abuse its discretion in granting the preliminary injunction.

■ Defendants argue the Band has the sole regulatory power over cigarette sales, relying on broad language from *Montana v. United States* (1981) 450 U.S. 544, 565–566 [67 L.Ed.2d 493, 101 S.Ct. 1245], in which the United States Supreme Court said: "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [Citations.] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. [Citations.]"

■ *Montana* was preceded by cases in which the court expressed general principles about a state's authority to regulate the conduct of non-Indians or

nontribal members on a reservation, upholding the authority of states to tax cigarette sales on Indian reservations, with exceptions for sales to tribes and their members. (*Moe, supra*, 425 U.S. at pp. 482–483.)

The Court also sustained state cigarette excise taxes on non-Indian purchasers from Indians or tribes: "It is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest. [Citations.] What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation. The Tribes assert the power to create such exemptions by imposing their own taxes or otherwise earning revenues by participating in the reservation enterprises. If this assertion were accepted, the Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom from surrounding areas. We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." (*Washington, supra*, 447 U.S. at p. 155.) The court rejected many of the same arguments made by defendants here, including the latest one: "A second asserted ground for the invalidity of the state taxes is that they somehow conflict with the Tribes' cigarette ordinances and thereby are subject to pre-emption or contravene the principle of tribal self-government. This argument need not detain us. There is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other. Although taxes can be used for distributive or regulatory purposes, as well as for raising revenue, we see no nonrevenue purposes to the tribal taxes at issue in these cases, and, as already noted, we perceive no intent on the part of Congress to authorize the Tribes to pre-empt otherwise valid state taxes. Other provisions of the tribal ordinances do comprehensively regulate the marketing of cigarettes by the tribal enterprises; but the State does not interfere with the Tribes' power to regulate tribal enterprises when it simply imposes its tax on sales to nonmembers. Hence, we perceive no conflict between state and tribal law warranting invalidation of the State's taxes." (*Id.* at pp. 158–159.)[4]

■ The foregoing authorities were distilled in 1983 in *New Mexico v. Mescalero Apache Tribe, supra*, 462 U.S. at pages 331–332: "On numerous occasions this Court has considered the question whether a State may assert

---

[4] A federal district court has observed there is no "evidence of a federal policy favoring or promoting tribal control over the sale of cigarettes or confirming the power of tribes to regulate such sales. In fact, the federal government has been generally supportive of state regulation of cigarette sales." (*Ward v. New York* (W.D.N.Y. 2003) 291 F.Supp.2d 188, 204.)

authority over a reservation . . . and have acknowledged certain limitations on tribal sovereignty. For instance, we have held that Indian tribes have been implicitly divested of their sovereignty in certain respects by virtue of their dependent status, that under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and that in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." (Fns. omitted.)

 More recently, the court has said where there is no federal preemption and the state has a strong off-reservation interest, the state's authority extends to conduct on the reservation, including even Indians and tribal members: "Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that 'the Court departed from Chief Justice Marshall's view that "the laws of [a State] can have no force" within reservation boundaries. [Citation.]' [Citation.] [Fn. omitted.] 'Ordinarily,' it is now clear, 'an Indian reservation is considered part of the territory of the State.' [Citations.]'

"That is not to say that States may exert the same degree of regulatory authority within a reservation as they do without. To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.' [Citations.] 'When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.' [Citation.] When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified by our decision in [*Washington v. Confederated Tribes*]. In that case, Indians were selling cigarettes on their reservation to nonmembers from off-reservation, without collecting the state cigarette tax. We held that the State could require the Tribes to collect the tax from nonmembers, and could 'impose at least "minimal" burdens on the Indian retailer to aid in enforcing and collecting the tax,' *Washington, supra*, 447 U.S. at 151." (*Nevada v. Hicks* (2001) 533 U.S. 353, 361–362 [150 L.Ed.2d 398, 121 S.Ct. 2304].)

As we have explained, the United States Supreme Court has confirmed a state's authority to tax and regulate cigarette sales to non-Indians. In the present case, since 1985, the Band's tribal ordinance has required compliance with California laws governing cigarette sales. In February 2010, the tribal council advised that Black Hawk was operating illegally, "contrary to Tribal Law."

The California tobacco directory law promotes public health by increasing the costs of cigarettes and discouraging smoking. (Rev. & Tax. Code, § 30165.1, subds. (b) & (e); Health & Saf. Code, § 104555.) The California Cigarette Fire Safety and Firefighter Protection Act—providing ignition-propensity requirements—serves the public interest in reducing fires caused by cigarettes. Likewise, California has an important state interest in enforcing the unfair competition law (Bus. & Prof. Code, § 17200) and the federal and state laws taxing cigarettes (18 U.S.C. § 2341 et seq.). No federal or tribal interest outweighs the state's interest in collecting cigarette tax revenue or in enforcing the California tobacco directory and cigarette fire safety laws. The People established they are likely to succeed on the merits of their claims.

## C. *Grave or Irreparable Harm*

■ Where a public entity seeks an injunction, the second traditional factor of weighing the relative harm to the parties usually does not apply. The trial court generally presumes the harm to the public outweighs the harm to the defendant if the public entity shows a likelihood of success: "Once a governmental entity establishes that it will probably succeed at trial, a presumption should arise that public harm will result if an injunction does not issue. However, some consideration must be given to the harm likely to be suffered by the defendant where that harm is alleged to be grave or irreparable.

"Accordingly, the propriety of an injunction must be judged by the following standard. Where a governmental entity seeking to enjoin the alleged violation of an ordinance which specifically provides for injunctive relief establishes that it is reasonably probable it will prevail on the merits, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant. [Fn. omitted.] If the defendant shows that it would suffer grave or irreparable harm from the issuance of the preliminary injunction, the court must then examine the relative actual harms to the parties." (*IT Corp. v. County of Imperial, supra,* 35 Cal.3d at p. 72.)

■ Defendants do not argue the trial court abused its discretion in determining either the relative harm to the parties or whether defendants would suffer grave or irreparable harm from the issuance of the preliminary injunction. The harm indentified by defendants—shutting down operations and employees—was refuted by the People's showing that Black Hawk could continue to operate by selling 219 brands of fire-safe-certified, tax-stamped cigarettes, listed on the state directory and purchased from state-licensed distributors. The showing of obvious public harm was not rebutted by a showing of grave or irreparable harm to defendants. Therefore, the trial court did not abuse its discretion by granting an injunction based on the arguments and evidence submitted in the trial court.

## IV

## DISPOSITION

The People have fully demonstrated the likelihood of success of their claims. Defendants have not shown grave or irreparable harm. The trial court did not abuse its discretion in granting the People's motion for a preliminary injunction.

We affirm the trial court's order granting the preliminary injunction. The People, as the prevailing party, shall recover costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.