Filed 3/13/13  In re Aiden H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re AIDEN H., a Person Coming Under the Juvenile Court Law. | |
| | D062565 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ012660) |
| v. | |
| E.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

E.C. appeals a juvenile court order terminating her reunification services as to her minor son, Aiden H., under Welfare and Institutions Code[1] section 388, subdivision (c)(1)(B), which allows for early termination of services if the inaction of a parent creates

_____

[1]     Statutory references are to the Welfare and Institutions Code.

a substantial likelihood reunification will not occur. E.C. contends the court abused its discretion by terminating her reunification services because it was likely she would reunify with her son Aiden. Alternatively, E.C. contends the court erred as a matter of law by terminating her services when Aiden's father, Justin H.,[2] was still receiving services with the goal of reunification, and by not setting a section 366.26 hearing. As we explain, we disagree with E.C.'s contentions and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2011, Aiden, then four years old, was picked up on a Friday at preschool by his paternal grandmother, who was to keep him for the weekend. That night, as she prepared to bathe Aiden, Aiden's grandmother observed a large, "purple welt on his hip." When Aiden's grandmother asked Aiden how he got the bruise, Aiden responded his mother hit him five times with a belt. Aiden's grandmother kept Aiden at her house and contacted the Child Abuse Hotline the following Monday.

Social worker Jennifer Olson interviewed Aiden's grandmother and Aiden. When Olson asked Aiden outside the presence of his grandmother about his "owie," Aiden immediately pulled up his shirt and showed Olson a large bruise on the left lower side of his abdomen. The bruise was purple and yellow and when Olson touched it, she could feel a knot under the skin. Aiden told Olson his mother hit him with her belt because he had wet the bed and held up five fingers to show Olson the number of times he was hit.

_____

[2]     Justin is not a party to this appeal.

2

Aiden's grandmother told Olson she usually picked up Aiden every Friday and kept the child until he went to school the following Monday. Aiden's grandmother also told Olson there have been times when she was either picking up or dropping off Aiden where E.C. was "extremely intoxicated" and thus unable to care properly for Aiden.

Olson next met with E.C., who resides in her mother's house. E.C. told Olson she was aware of Aiden's bruise and believed Aiden was injured while at his grandmother's house. When Olson asked E.C. when she first noticed the bruise, E.C. said she had "no idea," even after Olson encouraged E.C. to try and remember when she noticed it. E.C. said she asked Aiden how he got the bruise but the child said "he 'didn't know.' " E.C. also said she was not concerned by the bruise, she had applied ice to it and she did not believe Aiden needed to see a doctor about the bruise. E.C. mentioned Aiden probably got the bruise while " 'play[ing] rough' " with his cousin.

As they spoke, Olson believed she smelled alcohol on E.C.'s breath. E.C. denied being under the influence, stated she had just awakened (it was about 2:00 p.m. when Olson met with E.C.) and denied ever striking Aiden with a belt or any similar device.

Because E.C. could not explain how Aiden received the large bruise, Olson determined Aiden needed to remain in out-of-home care pending her investigation. Olson also directed E.C. to perform a drug test. E.C. failed to obtain the drug test over the next two days. E.C. first claimed she forgot to bring her identification to the test site and the next day claimed she arrived too late for testing to be completed.

In her detention report, Olson described a previous child welfare referral from February 2011 related to inadequate supervision of Aiden, physical discipline and E.C.'s

3

substance abuse. That referral was closed as unfounded. However, at that time respondent San Diego County Health and Human Services Agency (Agency) advised E.C. about its concerns regarding the physical discipline and supervision of Aiden and her substance use.

In late September 2011, the Agency filed a section 300, subdivision (a) petition, alleging E.C. subjected Aiden to serious physical harm and the substantial risk of such harm by using excessive discipline and physical abuse and damage, including hitting Aiden five times with a belt because the child wet his bed, leading to a large bruise and welt on the child's hip.

At the detention hearing, the court found the Agency made a prima facie showing Aiden came within the meaning of subdivision (a) of section 300, to wit: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." The court ordered Aiden be detained in out-of-home care and granted the parents separate supervised visitation with Aiden.

On the same day as the detention hearing, substance abuse specialist Monica Paniagua referred E.C. to a substance abuse treatment program. Paniagua's notes indicate Paniagua believed E.C. was under the influence of alcohol during their initial meeting and during the detention hearing, and in fact states that E.C.'s mother encouraged E.C. to have two "shots of citrus vodka before court to calm" E.C.'s nerves.

E.C. began treatment on October 6, 2011. A week later, E.C. tested positive for alcohol. E.C. also tested positive for alcohol on November 7 and November 11, 2011.

4

E.C. also had seven absences from the treatment program, and one test was too diluted to be valid. As a result, by November 22, 2011, E.C.'s treatment program reported her progress was unsatisfactory and placed her on the wait list for a detoxification program. Additionally, E.C.'s substance abuse counselor recommended E.C. enroll in a residential treatment program.

Social worker Janet Parat, in her October 2011 jurisdiction and disposition report and accompanying addendum reports, recommended the court make true findings on the section 300, subdivision (a) petition, Aiden continue to remain in out-of-home care and both parents be offered reunification services. E.C.'s case plan required her to meet with the substance abuse specialist for screening and referral to an appropriate substance abuse program; complete a substance abuse program referred by the substance abuse specialist and submit to on-demand drug testing; engage in therapy with a treatment evaluation review management team (TERM) therapist and, based on that therapist's recommendation, participate in a 52-week domestic violence prevention program or a 12-week support group for domestic violence victims; and complete a parenting program.

At the contested jurisdiction and disposition hearing in late November 2011, the court sustained the allegations of the section 300, subdivision (a) petition based on findings made by clear and convincing evidence and adopted the Agency's recommendations.

Parat, in her May 2012 status review report, noted the Agency could not determine whether E.C. then was participating in individual therapy *and* a domestic violence program, as required by her case plan.

In early January 2012, E.C. tested positive for alcohol. E.C. claimed the positive test resulted from medication use. As a result of the positive test, E.C. was required to attend a detoxification program. On February 2, E.C.'s substance abuse counselor reported E.C. smelled of alcohol. E.C. subsequently tested positive for alcohol on February 6. E.C. again tested positive for alcohol on February 21. Because E.C. continued to test positive for alcohol and because her attendance at the treatment program was "poor," which ultimately led to her discharge from the program because of "excessive unexcused absences," residential treatment was recommended for E.C.

In late February 2012, E.C. met with Paniagua for a referral to an in-patient program. Paniagua noted E.C. smelled of alcohol but E.C. denied consuming any.

Aiden's foster mother reported E.C. was not calling Aiden. E.C. previously participated in supervised visits with Aiden twice a week at a visitation center while E.C. attended outpatient substance abuse treatment. The visitation records indicated E.C. failed to appear at three of the visits in March 2012. The Agency's last report of a visit between E.C. and Aiden was on March 15, 2012.

In late May 2012, Parat advised E.C. to contact the substance abuse specialist for referrals. E.C. reported she did not finish parenting classes, and had six or seven classes left. E.C. also reported that she could not participate in an in-patient treatment program because she did not want to quit her job; that she last drank on her birthday on April 1, 2012; and that she did not need any other referrals at this time. Parat gave E.C. the substitute care provider's telephone contact information so E.C. could have telephone contact and schedule visits with Aiden. Parat also offered to coordinate for E.C. a visit

with Aiden. However, E.C. stated she was not sure how she could be reached to know when to visit Aiden. Parat told E.C. that before the late June 2012 hearing, it was important for E.C. to show she was in services, making progress and visiting Aiden.

In mid-June 2012, Parat again gave E.C. the substitute care provider's telephone number to call Aiden and schedule a visit. E.C. told Parat that she was not then participating in any services because she was working full time. In response, Parat warned E.C. her services could be terminated at the next court hearing and without services, she would be unable to unify with Aiden.

Although the Agency in its May 2012 report continued to recommend services for both parents, in early June 2012 Aiden filed a petition under section 388, subdivision (c), seeking to modify the court's previous order providing services to the parents. Aiden instead asked the court to terminate services to both parents and set a selection and implementation hearing pursuant to section 366.26.

Aiden in his petition alleged he would benefit from the requested modification because his parents had not participated in any court-ordered reunification services; they continued to use drugs/alcohol; neither parent had visited him since March 2012; Aiden felt sad when E.C. failed to arrive for a visit; he referred to his caretakers as "mom and dad" and referred to his parents by their first names; and he needed stability and permanence.

Despite E.C.'s last-minute efforts to engage in services and set up visits with Aiden, the Agency, in its July 11, 2012 report submitted on Aiden's section 388, subdivision (c) motion, noted the lack of contact between Aiden and his parents was

7

concerning "because visitation is a key component of reunification." In so doing, the Agency noted it had been about four months since E.C. had contacted Aiden; she had not been in a substance abuse treatment program for about four months; she had not started therapy with a TERM therapist or enrolled in any type of domestic violence group; and she had not completed her parenting classes, all of which were requirements of her case plan.

About a week before the contested section 388, subdivision (c) modification hearing, E.C. attended two group sessions at an outpatient alcohol/drug treatment program. E.C. tested negative for alcohol and said she intended to start supervised visits with Aiden in about two weeks.

The court held a contested hearing on Aiden's section 388, subdivision (c) petition. After considering the evidence and arguments of all counsel, the court terminated E.C.'s reunification services under section 388, subdivision (c)(1)(B), but denied the petition as to Justin, finding he had made good progress with the provisions of his case plan. The court ordered the Agency to provide Justin with services to the 12-month date.

DISCUSSION

A.   *Termination of E.C.'s Services under Section 388, Subdivision (c)(1)(B)*

We initially turn to E.C.'s second contention that the court erred as a matter of law when it terminated her reunification services while at the same time continuing Justin's services. This court recently addressed this identical issue in the case of *In re Katelynn Y.*

8

(2012) 209 Cal.App.4th 871.[3]  There, we held the court acted within its discretion in terminating reunification services as to mother but not father, on the child's petition for modification seeking termination of both parents' services, where mother's failure to participate in court-ordered services during the first six months of reunification created a substantial likelihood that she would not reunify with child.

In reaching our decision, we noted "the court does not consider the parents as one unit, but instead treats each of them on his or her own merits.  'Indeed, at each review hearing, the court must evaluate the efforts or progress toward reunification made by each parent individually by considering "the extent to which *he or she* availed *himself or herself* to services provided." [Citations.]  Although the purpose of services is to facilitate a child's return to parental custody, reunification often involves one, but not both, parents.  [¶] Because reunification services are a benefit, not a constitutional entitlement, the juvenile court has discretion to terminate those services at any time, depending on the circumstances presented.  [Citation.]  In deciding whether to terminate the services of one parent who has failed to participate or make progress toward reunification, the court is not constrained by a consideration of the other parent's participation in services.' [Citation.]"  (*In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 877.)

---

[3]    We note that *In re Katelynn Y.* was decided in late September 2012, about a week *before* E.C. filed her opening brief in this proceeding.  In any event, we note that E.C. completely ignored *In re Katelynn Y.* in her reply papers, after respondent Agency discussed this case at length in its brief.

We also considered the language of section 388, subdivision (c)(1)(B), and noted it referred to the " 'action or inaction of the parent,' and the 'failure of the parent' to visit the child or participate regularly and make substantive progress in a court-ordered treatment plan. The Legislature's use of the singular 'parent' underscores its intent to allow services to be provided or continued for one parent but not the other. [Citation.] This interpretation is entirely consistent with the notion that 'at no time during the reunification process does the court's offer of continued services to one parent depend solely on the efforts of the other parent.' [Citation.] It also furthers the legislative determination that, in some circumstances, efforts to continue reunification for a parent do not serve and protect a minor's best interests. [Citation.] Because [mother's] inaction created a substantial likelihood that reunification with [the minor] would not occur, section 388, subdivision (c)(1)(B) allowed the court to terminate [mother's] services while still offering services to [father]." (*In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 878.)

We see no reason to revisit this issue—nor has E.C. provided us any[4]—under the circumstances of the instant case, which is nearly identical to the facts of *In re Katelynn Y*. We thus reject E.C.'s contention the court erred when it terminated her reunification services while continuing those services for Justin.

We also reject E.C.'s related contention that the court erred when it refused to set a section 366.26 hearing after it terminated her reunification services but not the services of

---

4       See footnote 3, *ante*.

Justin.  Again, we addressed this identical issue in *In re Katelynn Y.* when we held the court was not divested of authority to terminate mother's reunification services under section 388, subdivision (c)(1)(B) without also setting a section 366.26 hearing.

"Under section 388, subdivision (c)(4), '[i]f the court terminates reunification services, it shall order that a hearing [under] [s]ection 366.26 be held within 120 days.' Citing this provision, [mother, like E.C. here,] asserts the court violated the mandate of the statute because it terminated her reunification services without setting a section 366.26 hearing.  However, we believe a fair reading of section 388, subdivision (c)(4), together with subdivision (c)(1)(B), and in light of the legislative history and statutory scheme as a whole, compels the conclusion that the court retains discretion to terminate services to one parent before the applicable statutory period has expired even if it does not set a section 366.26 hearing because the other parent is still receiving services.

"[¶] . . . [¶]

"We decline to adopt an interpretation of section 388, subdivision (c) that would nullify the court's well-established authority to terminate one parent's services without setting a section 366.26 hearing because the other parent is still being offered reunification services.  [Mother's] interpretation would result in the absurd consequence of giving her a benefit—further reunification services—to which she is not otherwise entitled." (*In re Katelynn Y., supra*, 209 Cal.App.4th at pp. 878-879.)

11

B.  *The Court Did Not Abuse Its Discretion by Terminating E.C.'s Reunification Services*

E.C. contends that even if the court could, as a matter of law, terminate her services under section 388, subdivision (c) while continuing Justin's services, it abused its discretion by doing so under the facts of this case.

Under section 388, subdivision (c)(1)(B), any party to a dependency action may petition the court prior to the six-month review hearing held under section 366.21, subdivision (e) to terminate court-ordered reunification services because "[t]he action or inaction of the parent or guardian creates a substantial likelihood that reunification will not occur, including, but not limited to, the parent or guardian's failure to visit the child, or the failure of the parent or guardian to participate regularly and make substantive progress in a court-ordered treatment plan."  (§ 388, subd. (c)(1)(b).)

A court's ruling on a section 388 petition is reviewed for abuse of discretion. (*In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 881.)  "In exercising its discretion, the court has 'the ability to evaluate whether the parent will utilize additional services and whether those services would ultimately inure to the benefit of the minor.'  [Citation.] We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our judgment for that of the juvenile court."  (*Ibid.*)  A parent seeking additional reunification services bears the burden of

12

showing how an order continuing services would serve the best interests of the child. (*Ibid.*; see also *In re William B.* (2008) 163 Cal.App.4th 1220.)

The evidence in the record, which we conclude is substantial, shows that up until the week before the contested section 388, subdivision (c) modification hearing, E.C. had not contacted Aiden for approximately four months; that in late May 2012, Parat offered to help E.C. make contact with Aiden, and even gave E.C. the substitute care provider's telephone contact information so E.C. could have telephone contact and schedule visits with Aiden; that in response, E.C. told Parat she was not sure how she could be reached to know when to visit Aiden; that Parat warned E.C. that it was vital for E.C. to show she was making progress in services and visit with Aiden; that about a month later, Parat again gave E.C. the substitute care provider's telephone number to call Aiden and schedule a visit, which E.C. again did not do; that E.C. told Parat that she was not then participating in any services because she was working full time; that Parat in response again warned E.C. that under the circumstances E.C.'s services could be terminated at the next court hearing and without services she would be unable to unify with Aiden; that E.C. had not participated in a substance abuse treatment program for approximately four months up until the eve of the section 388, subdivision (c) modification hearing; that E.C. had not yet started therapy with a TERM therapist or enrolled in any time of domestic violence group; and that E.C. also had not completed her parenting classes. On this record, we cannot say the court's decision to terminate her services under section 388, subdivision (c)(1)(B) was arbitrary, capricious or patently absurd. (See *In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 881.)

13

That E.C. claims she was likely to reunify with Aiden given her last-minute efforts is not the test in determining whether the court abused its discretion. It is not our role to reweigh the evidence and make a new determination, which is essentially what E.C. is asking this court to do. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [noting as trier of fact, it is the juvenile court's role to assess the credibility of the witnesses and to weigh the evidence to resolve conflicts in the evidence and noting it is not within the purview of a court of review "to judge the effect or value of the evidence, to [re]weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence"]; see also *People ex rel. Brown v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561, 1567 [" 'In determining whether [a trial court abuses its discretion], we cannot reweigh evidence or pass upon witness credibility.' "].)

We thus conclude the juvenile court properly exercised its discretion when it granted Aiden's section 388, subdivision (c)(1)(B) petition as to E.C..[5] (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [noting determination of a petition to modify under section 388 is committed to the sound discretion of the juvenile court and absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld on review].)

---

[5]    In reaching our decision, we considered the November 21, 2012 letter brief filed in this proceeding by Aiden, which argued it was in his best interests to affirm the court's order terminating E.C.'s reunification services.

14

DISPOSITION

The order is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

McINTYRE, J.