Filed 9/28/17; pub. order 10/17/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc.,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>DARREN PAUL ROSE,<br><br>      Defendant and Appellant. | C080546<br><br>(Super. Ct. No. 176689) |

Defendant Darren Paul Rose, who is a member of the Alturas Indian Rancheria, ran two smoke shops, Burning Arrow I and Burning Arrow II, located in Indian country but far from any lands governed by the Alturas Indian Rancheria. In those smoke shops, Rose sold illegal cigarettes and failed to collect state taxes. The People of the State of California brought an enforcement action to stop illegal sales and collect civil penalties. Based on findings that Rose violated the California tobacco directory law and the

1

California Cigarette Fire Safety and Firefighter Protection Act and failed to collect and remit state cigarette excise taxes, the superior court imposed civil penalties of $765,000 under the unfair competition law and granted injunctive relief to the People.

Rose contends on appeal that: (1) California and its courts do not have jurisdiction to enforce California's civil/regulatory laws for his actions in Indian country and (2) the amount of civil penalties imposed was inequitable and erroneous. We conclude that: (1) federal law and tribal sovereignty do not preempt California's regulation and enforcement of its laws concerning sales of cigarettes and (2) the superior court's imposition of civil penalties was proper.

BACKGROUND

Until 2003, Rose was a member of the Karuk Indian tribe. But in that year he executed a contract that made him a member of the Alturas Indian Rancheria, which is located in Modoc County.

From November 2011 to 2013 or 2014, Rose owned and operated two smoke shops, Burning Arrow I and Burning Arrow II, where he sold cigarettes not approved for sale in California. During that time, Rose sold at least 51,000 cartons of cigarettes of the following brands: Couture, Heron, King Mountain, Opal, Sands, Sky Dancer, and Seneca. For the most part, Rose failed to keep records reflecting the sales, including to whom the sales were made; however, there was evidence that people drove from as far away as southern California to purchase tax-free cigarettes at the smoke shops. Rose presented no evidence that he sold any cigarettes to members of Alturas Indian Rancheria or to any other Indians.

Burning Arrow I was located on the Benter Allotment near Yreka in Siskiyou County. And Burning Arrow II was located on the Henry Wallace Allotment near Ono in Shasta County. Allotments are remnants of reservations and are "Indian country" under federal law. (18 U.S.C. § 1151, see also *Hydro Res., Inc. v. United States EPA* (10th Cir. 2010) 608 F.3d 1131, 1159.) Each of the two allotments in this case is more than 150

2

miles from the Alturas Indian Rancheria, and the Alturas Indian Rancheria holds no interest in either allotment. The allotments are held in trust by the United States government, and Rose holds a fractional ownership interest in each of the allotments, which he obtained as a member of the Karuk tribe.

Under the tobacco directory law, the state maintains a directory of cigarette brands that may be sold in California. Listing depends on the manufacturer's taking financial responsibility for smoking-related health care costs. Sale of cigarettes not listed in the directory is illegal. (Rev. & Tax. Code, § 30165.1; Health & Saf. Code, § 104555.) The cigarettes sold by Rose in his smoke shops were not listed in the directory.

Under the California Cigarette Fire Safety and Firefighter Protection Act, cigarettes cannot be sold in California if they do not meet requirements for reduced ignition propensity and have not been certified and marked as meeting those requirements. (Health & Saf. Code, §§ 14950-14952.) None of the cigarettes sold by Rose met those requirements.

Rose failed to collect the $8.70 state excise tax imposed on each carton of cigarettes and failed to remit any excise tax to the state.

Before Rose's purchase and individual ownership of the smoke shops, Rose assisted with the management and operation of those smoke shops on behalf of the Alturas Indian Rancheria, which owned them. In March 2009 and May 2010, the Bureau of Indian Affairs, recognizing that California has authority to collect excise taxes on cigarettes sold to non-Indians in Indian country, sent cease and desist letters to Rose demanding that he stop selling tax-free cigarettes. The 2009 letter informed Rose that "the State of California may seize the cigarettes or other products and arrest you and/or any others involved in the operation. You may also be subject to repayment for all back taxes and any penalties levied by the State. Accordingly, we advise you to cease all operations."

In December 2012, the California Attorney General's office sent defendant a cease and desist letter, notifying Rose that he was violating the state's cigarette excise tax laws and was therefore in violation of California's unfair competition law. (See Bus. & Prof. Code § 17200 et seq.)

After receiving the cease and desist letters, Rose continued selling cigarettes. Rose violated the state laws more than 51,000 times, depriving the People of more than $443,700 in tax revenue.

In February 2013, the People filed this action in the superior court. The complaint alleged violations of the tobacco directory law, California Cigarette Fire Safety and Firefighter Protection Act, and the state excise tax laws. Based on those statutory violations, the complaint also alleged violation of the unfair competition law. The complaint sought preliminary and permanent injunctive relief and civil penalties.

The superior court granted the People's motion for a preliminary injunction. The court also granted summary adjudication on the People's tobacco directory law and California Cigarette Fire Safety and Firefighter Protection Act causes of action. However, the court denied summary adjudication on the unfair competition law cause of action because triable issues remained concerning the extent of the statutory violations and the appropriate civil penalties.

After trial, the superior court determined Rose violated the unfair competition law at least 51,000 times and that the law allows the court to impose civil penalties up to $2,500 per violation. (Bus. & Prof. Code, § 17206, subds. (a) & (b).) On its findings that Rose has substantial assets and that Rose chose not to offer any relevant, admissible

4

evidence concerning his ability to pay civil penalties, the court imposed civil penalties of $15 per violation, for a total of $765,000. The court also issued a permanent injunction.[1]

DISCUSSION

I

*Subject Matter Jurisdiction*

Rose asserts: "The unavoidable practical and legal effect of the Superior Court's final judgment is the illicit rejection of long-standing federal law through the illegitimate extension of California's commercial laws to lands designated as Indian country, and held in trust by the United States for Rose's benefit." To the contrary, California's application of its commercial laws to Rose's illicit activities is neither prohibited by federal law nor preempted by federal law and tribal sovereignty. While Congress has not expressly given California jurisdiction over civil/regulatory matters, such as the regulation of cigarette sales, in Indian country, such jurisdiction is proper in this case because it is not preempted by federal law or tribal sovereignty.

A.       *Application of California's Civil/Regulatory Laws Concerning Cigarette Sales*

Indian tribes "retain 'attributes of sovereignty over both their members and their territory' [citation], and . . . 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States' [citation]." (*California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 207 [94 L.Ed.2d 244, 253] (*Cabazon*).) In Public Law 280, Congress gave California broad criminal and limited civil jurisdiction over Indian reservations in the state. (18 U.S.C. § 1162(a); 28 U.S.C. § 1360(a); *Cabazon, supra,* at p. 207.) But this limited civil jurisdiction applies only to "private civil litigation

---

[1]       In its statement of decision, the superior court found that Rose's testimony in this case was not credible, based on his demeanor, his evasive and misleading testimony, and the numerous times his testimony was successfully impeached.

involving reservation Indians in state court." (*Bryan v. Itasca County* (1976) 426 U.S. 373, 385 [48 L.Ed.2d 710, 719].) Nothing in Public Law 280 allows the state to impose its civil/regulatory laws, such as those at issue here, on activities in Indian country. (*Cabazon, supra,* 480 U.S. at p. 208.)

Rose argues that the "determinative factor" in this case is whether the allotments on which he operated his smoke shops are Indian country. He claims that the allotments are Indian country. He further argues that "Public Law 280 prohibits the application of California civil regulatory laws to [Rose's] 'Indian country' conduct." Much of Rose's opening brief on appeal is an argument that California does not have jurisdiction under Public Law 280 to regulate the sale of cigarettes in Indian country. This approach, however, is unavailing because whether or not Public Law 280 allows California to regulate the sale of cigarettes in Indian country is not dispositive, as will be seen. Public Law 280 does not prohibit application of California's civil/regulatory laws, even if it does not provide for such application.

Public Law 280 is not the only source for state jurisdiction over matters in Indian country. In fact, it does not address state jurisdiction over civil/regulatory matters. Other authorities provide that the state may assert jurisdiction over civil/regulatory matters if such assertion of jurisdiction is not preempted by federal law and tribal sovereignty. The California Supreme Court summarized this species of preemption in *People v. McCovey* (1984) 36 Cal.3d 517 (*McCovey*), which we quote at length:

" '[There] is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members.' (*White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136, 142 [65 L.Ed.2d 665, 671-672] [hereafter *White Mountain Apache Tribe*].) However, the traditional notions of Indian self-government which are 'deeply ingrained in our jurisprudence' provide a crucial ' "backdrop" ' in answering such a question. (*Id.*, at p. 143 [65 L.Ed.2d at p. 672].)

6

"The United States Supreme Court has cautioned that '[it] must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government.' (*McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 172 [36 L.Ed.2d 129, 136].) The status of these tribes has been described as ' " 'an anomalous one and of complex character,' " for despite their partial assimilation into American culture, the tribes have retained " 'a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations . . . .' " ' (*White Mountain Apache Tribe, supra,* 448 U.S. at p. 142 [65 L.Ed.2d at p. 672].)

"Congress, however, has broad power to regulate Indian tribes under the Indian Commerce Clause. Thus, '[the] right of tribal self-government is ultimately dependent on and subject to the broad power of Congress.' (*White Mountain Apache Tribe, supra*, 448 U.S. at pp. 142-143 [65 L.Ed.2d at pp. 671-672].) This power, along with the tribes' semi-independent position, has 'given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members.' (*Id.*, at p. 142.) First, state authority may be preempted by federal law. Second, it may interfere with ' "the right of reservation Indians to make their own laws and be ruled by them." ' (*Ibid.*, quoting *Williams v. Lee* (1959) 358 U.S. 217, 220 [3 L.Ed.2d 251, 254].) 'The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.' (*White Mountain Apache Tribe, supra*, 448 U.S. at p. 143 [65 L.Ed.2d at p. 672].)

"The doctrine of preemption applies in a 'special sense' to cases involving Indians and Indian tribes. (*New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 333-334 [76 L.Ed.2d 611, 620] [(*Mescalero*].) 'Although a State will certainly be without jurisdiction if its authority is preempted under familiar principles of preemption, . . . prior

7

cases [do] not limit preemption of State laws affecting Indian tribes to only those circumstances.' (*Ibid.*)  In fact, the Supreme Court has noted that '[the] unique historical origins of tribal sovereignty make it generally unhelpful' to apply preemption standards that have emerged in other areas of the law to cases where Indians are federally regulated. (*White Mountain Apache Tribe, supra,* 448 U.S. at p. 143 [65 L.Ed.2d at p. 672].)

"As the court has explained, '[tribal] reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other.' (*Ibid.*)  In addition, the court has rejected the proposition that Indian preemption requires 'an express congressional statement to that effect.' (*Id.*, at p. 144 [65 L.Ed.2d at p. 673].)  Rather, the Indian preemption question requires 'a particularized inquiry into the nature of the state, federal, and tribal interests at stake.' (*Id.*, at p. 145 [65 L.Ed.2d at p. 673].)

"The Indian preemption cases focus on the scope and the nature of federal regulation in the area.  Where there exists a 'pervasive' or 'comprehensive' federal regulatory scheme, state laws are preempted if they appear to 'disturb and disarrange' that scheme.  (*Warren Trading Post v. Tax Comm'n.* (1965) 380 U.S. 685, 690-691 [14 L.Ed.2d 165, 168]; accord [] *Mescalero* [], *supra,* 462 U.S. at p. 324 [76 L.Ed.2d at p. 623].)" (*McCovey, supra,* 36 Cal.3d at pp. 524-526.)

"The foregoing principles were . . . applied in [] *Mescalero* [], *supra,* 462 U.S. 324 [76 L.Ed.2d 611] []).  Since *Mescalero* is one of the Supreme Court's latest pronouncements in the area, a detailed analysis of that case is useful to the resolution of the preemption issue.

"With extensive federal assistance and supervision, the Mescalero Apache Tribe established a comprehensive scheme for the management of the reservation's fish and wildlife resources on its New Mexico reservation.  (*Mescalero, supra,* 462 U.S. at p. 325 [76 L.Ed.2d at p. 615].)  State authorities sought to prohibit nonmembers of the

8

reservation from possessing game killed in accordance with tribal regulations, but in violation of state regulations. (*Id.*, at pp. 328-329 [76 L.Ed.2d at pp. 616-617].)

"The *Mescalero* court reviewed the principles governing the Indian preemption cases and observed that 'State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority.' (462 U.S. at p. 334 [76 L.Ed.2d at p. 620].) The court then went on to note that in assessing federal and tribal interests, several principles guide the courts. Both the Indian tribes and the federal government 'are firmly committed to the goal of promoting tribal self-government.' (*Id.*, at pp. 334-335 [76 L.Ed.2d at p. 621].) That goal is embodied in numerous federal statutes and 'encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging "tribal self-sufficiency and economic development." ' (*Id.*, at p. 335 [76 L.Ed.2d at p. 621].) As a necessary implication of this broad commitment, an Indian tribe has 'the power to manage the use of its territory and resources by both members and nonmembers. [Citations.]' (*Id.*, 462 U.S. at p. 335 [76 L.Ed.2d at p. 621].)

"The court then discussed guidelines to be used in assessing the state's interest. 'The exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity. . . . A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention.' (*Mescalero, supra*, 462 U.S. at p. 336 [76 L.Ed.2d at p. 622].)

"It was upon this basis that the court held New Mexico could not superimpose its own hunting and fishing regulations on the tribe's regulatory scheme. (*Mescalero, supra,* 462 U.S. at pp. 342-343 [76 L.Ed.2d at pp. 626-627].) The court emphasized that 'concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation' by members and nonmembers. (*Id.*, 462 U.S. at pp. 339,

9

342 [76 L.Ed.2d at pp. 624, 626].) In effect the exercise of state jurisdiction would wholly supplant the tribal regulations. (*Id.*, at p. 338 [76 L.Ed.2d at p. 623].) Furthermore, permitting state regulation 'would completely "disturb and disarrange" . . . the comprehensive scheme of federal and tribal management established pursuant to federal law.' (*Ibid.*) Finally, the exercise of concurrent jurisdiction would 'threaten Congress' firm commitment to the encouragement of tribal self-sufficiency and economic development.' (*Id.* at p. 344 [76 L.Ed.2d at p. 627].)" (*McCovey, supra,* 36 Cal.3d at pp. 527-529, fns. omitted.)

The superior court in this case found that California's civil/regulatory laws concerning the sale of cigarettes are not preempted by federal law or tribal sovereignty. Concerning California's jurisdiction to regulate Rose's sale of cigarettes in Indian country, the superior court wrote in its statement of decision: "[Rose's] status as an individual Native American operating his own smoke shop on a fractional share of a federal allotment does not bar this action based on federal preemption. California's valid and compelling state interests of promoting public health by increasing the costs of cigarettes, ensuring that cigarettes comply with ignition propensity requirements to reduce the incidence of fires and burns caused by cigarettes, and the collection of cigarette tax revenues significantly outweigh the unidentified tribal and/or federal interest that [Rose] contends permit[s] him to sell cigarettes that do not comply with California's taxation, tobacco Directory, and cigarette fire safety laws."

We agree that there is no preemption in this case. California's laws promote public health and fire safety both inside and outside Indian country within California's borders. There appear to be no federal statutes or regulations that would preempt California's statutory scheme. And the threat to Indian sovereignty is minimal, especially in a case such as this in which no tribe has expressed an interest in the matter.

The Fourth Appellate District reached the same conclusion in *People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561 (*Black Hawk*

10

*Tobacco*). In that case, the court, finding that California could impose its tobacco directory law, California Cigarette Fire Safety and Firefighter Protection Act, and unfair competition law on an Indian owned smoke shop in Indian country, wrote: "No federal or tribal interest outweighs the state's interest in collecting cigarette tax revenue or in enforcing the California tobacco directory and cigarette fire safety laws. The People established they are likely to succeed on the merits of their claims." (*Id*. at p. 1571.)

We therefore conclude that California had jurisdiction over cigarette sales at Burning Arrow I and Burning Arrow II.

B.       *Application of Balancing Test to Rose*

Rose claims that the balancing test for determining preemption, as discussed in *White Mountain Apache Tribe* and *Mescalero*, cannot be used to establish jurisdiction in this case because he is an Indian operating in Indian country. His reliance on that fact, however, does not help him. The commerce in which Rose engaged was not on his tribe's reservation and was with non-Indians. In *Washington v. Confederated Tribes of Colville Indian Reservation* (1980) 447 U.S. 134 [65 L.Ed.2d 10, 34] (*Colville*) the court wrote:

"Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt [a state's] power to impose its taxes on Indians not members of the Tribe. . . . [T]he mere fact that nonmembers resident on the reservation come within the definition of 'Indian' for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U. S. C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation. [¶] Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. *For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation.* There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that

11

the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes." (*Colville, supra,* 447 U.S. at pp. 160-161 [65 L.Ed.2d at p. 34], italics added; see also *State v. R.M.H.* (Minn. 2000) 617 N.W.2d 55, 64-65 [distinction between Indians on their own reservation and Indians on other reservations].)

While Rose holds an interest in the allotments, there is no tribal sovereignty issue involved in this case. Neither can he specify a federal priority that would allow him to avoid state regulation. Preemption exists to effectuate federal priorities and support tribal sovereignty, not to immunize nonmember Indians. Therefore, Rose stands on the same footing as non-Indians for the purpose of determining whether the State can assert its civil/regulatory authority over him.

C.      *Superior Court's Subject Matter Jurisdiction*

In his opening brief, Rose contends that Public Law 280 did not confer subject matter jurisdiction over Indian-country civil/regulatory matters on state courts. As noted above, the real question in this case is not about Public Law 280. Instead it is about whether California's civil/regulatory laws are preempted by federal law and tribal sovereignty. Rose's opening brief does not address whether state courts have subject matter jurisdiction when California's civil/regulatory laws are not preempted outside the ambit of Public Law 280.

In his reply brief, Rose changes the focus of his subject matter jurisdiction argument. He contends "that a state court [does not have] the power to adjudicate (subject matter jurisdiction) the question of whether a state can regulate the conduct of an Indian in Indian country."

This approach—challenging the superior court's subject matter jurisdiction over deciding whether California's civil/regulatory laws can be enforced in Indian country rather than challenging the jurisdiction of the state over civil/regulatory matters in Indian country—also fails.

12

In support of his argument that the superior court did not have subject matter jurisdiction over this civil/regulatory matter, Rose cites two cases – *Bryan v. Itasca County, supra*, 426 U.S. 373 (*Bryan*) and *Doe v. Mann* (9th Cir. 2005) 415 F.3d 1038 (*Mann*). But those cases addressed only whether Public Law 280 conferred subject matter jurisdiction on state courts. They did not address the broader issue of whether California and its courts have jurisdiction because such jurisdiction is not preempted by federal law and tribal sovereignty. This is not a Public Law 280 case.

In *Bryan*, Minnesota attempted to levy a state personal property tax on the mobile home of an enrolled member of the Minnesota Chippewa Tribe who resided in the mobile home on land held in trust by the United States. However, the United States Supreme Court held that Public Law 280 did not give the state authority to levy the tax on reservation Indians. (*Bryan, supra,* 426 U.S. at pp. 379-390.) The *Bryan* court said nothing about state-court subject-matter jurisdiction.

Likewise, *Mann* involved application of Public Law 280. In that case, the Ninth Circuit of the United States Court of Appeals held that the Indian Child Welfare Act (ICWA) did not provide exclusive jurisdiction to a tribe in involuntary child custody proceedings. Public Law 280 and ICWA divested the tribe of exclusive jurisdiction over involuntary child custody proceedings. (*Mann, supra,* 415 F.3d at pp. 1061-1068.)

California courts have routinely exercised subject matter jurisdiction in cases in which the state's civil/regulatory laws may be applied to Indian country. (See, e.g., *McCovey, supra,* 36 Cal.3d 517; *Black Hawk Tobacco, supra,* 197 Cal.App.4th 1561; see also *State v. R.M.H., supra,* 617 N.W.2d 55 [finding by Minnesota Supreme Court of state's jurisdiction over traffic laws on state highway in Indian country].) Rose provides no authority for the proposition that this exercise of jurisdiction has been illegitimate. We therefore reject his contention that the superior court did not have subject matter jurisdiction in this case.

13

## II

### *Violations of Unfair Competition Law*

Rose contends that the superior court's imposition of $765,000 in civil penalties was "inequitable and erroneous" because "a full seventy-one percent (71%) of the 51,000 sales the Superior Court attributed to Rose occurred, before any agency, department or division of the State of California ever indicated to him that the cigarettes he offered were not legal for sale in California. Rather, the Attorney General's office sat on the issue and intentionally allowed Rose's potential liability to steadily increase."

We reject Rose's contention because it is contrary to the factual findings of the superior court. That court held:

- Rose knew or should have known that the cigarettes he sold were not included in the directory of brands that can be sold in California.
- The federal government, through the Bureau of Indian Affairs, notified Rose, starting in March 2009, that the sale of cigarettes was subject to California cigarette tax laws. Thus, all of the cigarette sales that the Superior Court attributed to Rose occurred after he was notified by the federal government that the sales were subject to California laws.
- "The Office of the Attorney [General] did not delay the filing of this case to prejudice [Rose]."
- Rose conceded that he would not have stopped violating California laws if the Attorney General had sent him a cease and desist letter in December 2011, after he purchased the smoke shops.

Since Rose's contention is inconsistent with the superior court's findings of fact and Rose does not contend that the evidence was insufficient to sustain the findings of fact, he has failed to support his contention. Therefore, we need not consider further his contention that the imposition of $765,000 was inequitable and erroneous.

14

DISPOSITION

The judgment is affirmed.  The People are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


    NICHOLSON    , Acting P. J.


We concur:


    DUARTE    , J.


    RENNER    , J.

Filed 10/17/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DARREN PAUL ROSE, <br><br> Defendant and Appellant. | C080546 <br><br> (Super. Ct. No. 176689) <br><br> CERTIFICATION FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Shasta County. Bradley L. Boeckman, Judge. Affirmed.

Fredericks Peebles & Morgan and Michael A. Robinson for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Karen Leaf, Senior Assistant Attorney General, Barry D. Alves, Deputy Attorney General, for Plaintiff and Respondent.

THE COURT:

1

For good cause it now appears that the opinion in the above captioned case filed herein on September 28, 2017, should be published in the Official Reports and it is so ordered.

FOR THE COURT:


      NICHOLSON      , Acting P. J.



      DUARTE      , J.



      RENNER      , J.